1

**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick, State Bar No. 004738

2

Seventh Floor Camelback Esplanade II
2525 East Camelback Road

3

Phoenix, Arizona 85016
Telephone: (602) 255-6000

4

Email:  rgh@tblaw.com
*Liaison Counsel for Plaintiff*

5

**THE ROSEN LAW FIRM, P.A.**

6

Phillip Kim
275 Madison Avenue, 34th Floor

7

New York, NY 10016
Telephone: (212) 686-1060

8

Email: pkim@rosenlegal.com

9

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown

10

240 Townsend Square
Oyster Bay, New York 11771

11

Telephone: (516) 922-5427
Email:  tbrown@thebrownlawfirm.net

12

*Counsel for Plaintiff*

13

UNITED STATES DISTRICT COURT

14

DISTRICT OF ARIZONA

15

16

Mark Kistenmacher, derivatively on behalf
of Microchip Technology Incorporated,

Case No.

17

Plaintiff,

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

18

v.

19

**(DEMAND FOR JURY TRIAL)**

Stephen Sanghi; Ganesh Moorthy; James

20

Eric Bjornholt; Matthew W. Chapman;
L.B. Day; Esther L. Johnson; and Wade F.

21

Meyercord,

22

Defendants,

23

24

and

25

Microchip Technology Incorporated,

26

27

Nominal Defendant.

28

## INTRODUCTION

Plaintiff Mark Kistenmacher ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Microchip Technology Incorporated. ("Microchip" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Stephen Sanghi, Ganesh Moorthy, James Eric Bjornholt, Matthew W. Chapman, L.B. Day, Esther L. Johnson, and Wade F. Meyercord (collectively, the "Individual Defendants" and together with Microchip, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Microchip, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Microchip, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by Microchip's directors and officers from March 1, 2018 through the present (the "Relevant Period").

2.    Microchip develops, manufactures, and sells semiconductor products for various embedded control applications.

3.    After markets closed on March 1, 2018, Microchip announced the signing of a definitive agreement to acquire Microsemi Corp. ("Microsemi"), a

designer and manufacturer of semiconductors. That press release asserted that "[f]ollowing the closing, the transaction is expected to be immediately accretive to Microchip's non-GAAP earnings per share."[1]

4.      The price per share of Microchip common stock reacted favorably to the announcement, closing at $91.29 on March 2, 2018, an increase of $2.27, or 2.5% from their closing price on March 1, 2018.

5.      The price per share of Microchip common stock continued to increase over the following six trading sessions closing at a March 2018 high of $100.24 on March 12, 2018, and closing higher than the previous trading day's close on all but one day between March 1 and March 12, 2018.

6.      In the two weeks following the announcement of the Microsemi transaction, and while the price of Microchip common stock was artificially inflated due to the false and misleading statements about the Microsemi transaction alleged herein, all five of the Company's directors sold Microchip shares on inside information, receiving an aggregate benefit of over $3.7 million.

7.      On May 29, 2018, the Company announced that it had completed the acquisition of Microsemi at a price of $68.78 per share, paid in cash.

8.      After markets closed on August 9, 2018, the Company issued a press release announcing its financial results for the quarter ended June 30, 2018, and held a conference call to discuss that quarter's earnings on the same day. During the earnings call, the Company revealed that, for approximately a year prior to its acquisition of Microsemi, Microsemi had engaged in aggressive practices aimed at increasing

---

[1] According to securedocs.com, "an accretive acquisition adds value to the acquiring company's earnings is usually because the target company, perhaps a smaller entity, will have higher earnings per share as compared to the acquiring company. As a result, when the lower and higher earnings per share are combined, the final earnings per share should be higher, provided that the cost to purchase the entity was low enough to create this net gain." Tara Naughter, What is an Accretive Acquisition?, Securedocs (Nov. 14, 2017), https://www.securedocs.com/blog/what-is-an-accretive-acquisition.

revenue by incentivizing customers and distributors to accept more product than they were able to sell through (a practice sometimes known as "channel stuffing"). Microsemi's aggressive sales practices allegedly went undetected during the due diligence process.

9.     Microsemi's sales practices had a negative impact on revenue for the quarter ended June 30, 2018, and was projected by the Individual Defendants to have a negative impact on the Company's revenue for the balance of calendar year 2018.

10.     On this news, price per share of Microchip stock declined from a close of $98.08 per share on August 9, 2018 to close at $87.41 per share on August 10, 2018 -- a drop of 10.9%, or $10.67.

11.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

12.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Microchip, willfully or recklessly made and/or caused the Company to make false and/or misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Microsemi acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that such acquisition would be "immediately accretive"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

15. Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, six of Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $4 million.

16. The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and its Chairman and Chief Executive Officer ("CEO") and its President and Chief Operating Officer ("COO") to a consolidated federal securities fraud class action lawsuit pending in this District (the "Securities Class Action"), the Company, its Chairman and CEO, its President and COO, its Chief Financial Officer ("CFO") and Vice President, and its Vice President, Worldwide Sales & Applications to a suit alleging claims for slander, libel, trade libel, and unfair competition under California law brought by former executives of Microsemi pending in the United States District Court for the Central District of California (the "Slander Action") and the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, and is costing the Company millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective

engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act of 1933 ("Securities Act") and the Exchange Act.

20.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    Venue is proper in this District because Microchip is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24.    Plaintiff is a current shareholder of Microchip. Plaintiff has continuously held Microchip common stock at all relevant times. Plaintiff is a citizen of the State of New Jersey.

**Nominal Defendant Microchip**

25.    Microchip is a Delaware corporation with its principal executive offices at 2355 W. Chandler Blvd., Chandler, Arizona 85224-6199. Microchip's shares trade on the NASDAQ under the ticker symbol "MCHP."

**Defendant Sanghi**

26.    Defendant Stephen Sanghi, Jr. ("Sanghi") founded Microchip, has served as a director since 1990, as the Company's CEO since 1991, and as Chairman of the Board since 1993. He previously served as the Company's President from 1990 to 2016. According to the Company's Schedule 14A filed with the SEC on July 12, 2018 (the "2018 Proxy Statement"), as of May 20, 2018, Defendant Sanghi beneficially owned 4,601,880 shares of the Company's common stock, representing 1.96% of all outstanding stock as of that date.[2] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Sanghi owned over $432.2 million worth of Microchip stock.

27.    For the fiscal year ended March 31, 2018, Defendant Sanghi received $7,893,460 in compensation from the Company. This included $740,042 in salary, $48,012 in bonus, $4,464,406 in stock awards, $2,632,141 in non-equity incentive plan compensation, and $8,859 in all other compensation.

28.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sanghi made no purchases of Company stock, and sold 20,124 shares of Company stock on March 6, 2018 at $94.80 per share, from which he benefited in the amount of approximately $1,907,755. His insider sale made with knowledge of

---

[2] Includes 1,648,944 shares held of record by The Sanghi Trust (the "Sanghi Trust") and 2,952,936 shares held of record by The Sanghi Family Limited Partnership (the "Family Limited Partnership"). Defendant Sanghi and Maria T. Sanghi are the sole trustees of the Sanghi Trust. The Sanghi Trust is the sole member of the Sanghi LLC which is the sole general partner of the Family Limited Partnership.

material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

29.     The Company's 2018 Proxy Statement stated the following about Defendant Sanghi:

> *Steve Sanghi*[3] has served as Chief Executive Officer since October 1991, and as Chairman of the Board since October 1993. He served as President from August 1990 to February 2016 and has served as a director since August 1990. In November 2016, Mr. Sanghi joined the Board of Directors of Myomo, Inc., a publicly traded commercial stage medical robotics company that offers expanded mobility for those suffering from neurological disorders and upper-limb paralysis. In February 2018, Mr. Sanghi joined the Board of Directors of Mellanox Technologies Ltd., a publicly traded supplier of end-to-end Ethernet and InfiniBand intelligent interconnect solutions and services for servers, storage, and hyper-converged infrastructure.

30.     Defendant Sanghi is a citizen of the State of Arizona.

**Defendant Moorthy**

31.     Defendant Ganesh Moorthy ("Moorthy") has served as the Company's COO since 2009, and as the Company's President since 2016. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Moorthy beneficially owned 234,193 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Moorthy owned approximately $22 million worth of Microchip stock.

32.     For the fiscal year ended March 31, 2018, Defendant Moorthy received $3,292,308 in compensation from the Company. This included $412,713 in salary, $28,523 in bonus, $2,252,329 in stock awards, $589,160 in non-equity incentive plan compensation, and $9,583 in all other compensation.

---

[3] Emphasis is in the original unless otherwise noted throughout.

[4] This figure includes 234,193 shares held of record by Defendant Moorthy and Hema Moorthy as trustees.

33.     The Company's website states the following about Defendant Moorthy:[5]

Mr. Moorthy was named the President of Microchip in February 2016. He served as Chief Operating Officer since June 2009 and as Executive Vice President from October 2006 to May 2009.  From November 2001 to October 2006 Mr. Moorthy served as Vice President of several Microchip divisions. Mr. Moorthy holds an M.B.A. in marketing from the National University, Sacramento, Calif.; a B.S. degree in electrical engineering from the University of Washington, Seattle, Wash.; and a B.S. degree in physics from the University of Bombay, Bombay, India.

34.     Defendant Moorthy is a citizen of the State of Arizona.

**Defendant Bjornholt**

35.     Defendant James Eric Bjornholt ("Bjornholt") has served as the Company's CFO and Vice President since 2009, and as Corporate Secretary since 2003. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Bjornholt beneficially owned 21,869 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Bjornholt owned approximately $2.1 million worth of Microchip stock.

36.     For the fiscal year ended March 31, 2018, Defendant Bjornholt received $1,068,118 in compensation from the Company. This included $256,094 in salary, $17,341 in bonus, $640,938 in stock awards, $145,739 in non-equity incentive plan compensation, and $8,006 in all other compensation.

37.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Bjornholt made no purchases of Company stock, and sold 2,308 shares of Company stock on May 22, 2018 in three separate sales at $93.55 per share each, from

---

[5] https://www.microchip.com/about-us/leadership. Last visited December 11, 2018.

[6] This figure includes 21,869 shares held of record by Defendant Bjornholt and Lynn Bjornholt as trustees.

which he benefited in the amount of approximately $215,913. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

38.     The Company's website states the following about Defendant Bjornholt:[7]

> Mr. Bjornholt has served as Vice President and Chief Financial Officer since January 2009, and has served as Corporate Secretary since 2003. He served as Director of Financial Reporting and Tax from 2003 to 2008. He has held various other financial management positions within Microchip since joining the company in 1995. Prior to joining Microchip, Mr. Bjornholt was employed by KPMG LLP. Mr. Bjornholt holds a B.S. degree in accounting from the University of Arizona and a Masters degree from Arizona State University.

39.     Defendant Bjornholt is a citizen of the State of Arizona.

**Defendant Chapman**

40.     Defendant Matthew W. Chapman ("Chapman") has served as a Company director since 1997, and serves as the Chair of the Audit Committee. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Chapman beneficially owned 23,469 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Chapman owned over $2.2 million worth of Microchip stock.

41.     For the fiscal year ended March 31, 2018, Defendant Chapman received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

42.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Chapman made no purchases of Company stock, and sold 6,000 shares of

---

[7] https://www.microchip.com/about-us/leadership. Last visited December 11, 2018.

Company stock on March 5, 2018 at $94.08 per share, from which he benefited in the amount of approximately $564,492. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

43.     The Company's 2018 Proxy Statement stated the following about Defendant Chapman:

> *Matthew W. Chapman* has served as a director of Microchip since May 1997. After serving for over 11 years, Mr. Chapman retired in February 2018 from his position as Chief Executive Officer of Northwest Evaluation Association, a not-for-profit education services organization providing computer adaptive testing for millions of students throughout the United States and in 140 other countries. In his career, Mr. Chapman has served as CEO and Chairman of Concentrex Incorporated, a publicly held company specializing in supplying software solutions and service to U.S. financial institutions. Mr. Chapman served as a member of the Board of Directors of the Oregon Business Association and Knowledge Alliance. He is currently serving on the Board of Regents of the University of Portland and the board of two not-for-profit organizations.

44.     Upon information and belief, Defendant Chapman is a citizen of the State of Oregon.

**Defendant Day**

45.     Defendant L.B. Day ("Day") has served as a Company director since 1994. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Day beneficially owned 10,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Day owned over $1 million worth of Microchip stock.

46.     For the fiscal year ended March 31, 2018, Defendant Day received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

47.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed,

Defendant Day made no purchases of Company stock, and on March 7, 2018, sold 3,000 shares of Company stock at $95.04 per share and another 3,000 shares of Company stock at $95.20 per share, from which he benefited in the amount of approximately $570,720. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

48.     The Company's 2018 Proxy Statement stated the following about Defendant Day:

> *L.B. Day* has served as a director of Microchip since December 1994. Mr. Day serves as President of L.B. Day & Company, Inc., which provides strategic planning, strategic marketing and organization design services to the elite of the technology world. He has written on strategic planning and is involved with competitive factor assessment in the semiconductor and other technology market segments, geared to helping client organizations incorporate competitive factor assessment findings into their strategic plans. He has served as a board member or as an advisor to many public and private boards board of two not-for-profit organizations.

49.     Upon information and belief, Defendant Day is a citizen of the State of Oregon.

**Defendant Johnson**

50.     Defendant Esther L. Johnson ("Johnson") has served as a Company director since 2013, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Johnson beneficially owned 6,081 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Johnson owned approximately $571,128 worth of Microchip stock.

51.     For the fiscal year ended March 31, 2018, Defendant Johnson received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

52.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Johnson made no purchases of Company stock, and sold 2,275 shares of Company stock on March 14, 2018 at $97.90 per share, from which she benefited in the amount of approximately $222,732. Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Johnson:

> *Esther L. Johnson* has served as a director of Microchip since October 2013. From April 2007 until her April 2012 retirement, Ms. Johnson served as the Vice President and General Manager of Carrier Electronics, a provider of high technology heating, air-conditioning and refrigeration solutions, and a part of United Technology Corporation, a publicly held company that provides high technology products and services to the aerospace and building systems industries. Prior to her position as Vice President and General Manager, since 1983, Ms. Johnson held a variety of other management positions with Carrier Electronics, including Director of Operations and Global Supply Chain Manager. Ms. Johnson was instrumental in Carrier being recognized by Industry Week as one of the "Top 10 Factories in North America." She has served as a board member on multiple private company boards.

54.     Upon information and belief, Defendant Johnson is a citizen of the State of Arizona.

**Defendant Meyercord**

55.     Defendant Wade F. Meyercord ("Meyercord") has served as a Company director since 1999, and serves as a member of the Audit Committee. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Meyercord beneficially owned 30,432 shares of the Company's common stock.[8] Given that the price per share of the

---

[8] As reported by the 2018 Proxy Statement, this figure includes 30,432 shares held of record by Defendant Meyercord and Phyllis Meyercord as trustees, and 3,000 shares issuable upon exercise of options that are exercisable within 60 days of May 20, 2018.

Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Meyercord owned approximately $2.9 million worth of Microchip stock.

56.     For the fiscal year ended March 31, 2018, Defendant Meyercord received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

57.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Meyercord made no purchases of Company stock, and sold 5,000 shares of Company stock on March 6, 2018 at $94.92 per share, from which he benefited in the amount of approximately $474,590. His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

58.     The Company's 2018 Proxy Statement stated the following about Defendant Meyercord:

> *Wade F. Meyercord* has served as a director of Microchip since June 1999. Since October 2002, he has served as President of Meyercord & Associates, Inc., a privately held management consulting firm specializing in executive compensation matters and stock plan consulting for technology companies, a position he previously held part time beginning in 1987. Mr. Meyercord served as a member of the Board of Directors of Endwave Corporation, a publicly held company, from March 2004 until it was acquired in 2011. Mr. Meyercord served as a member of the Board of Directors of California Micro Devices Corporation, a publicly held company, from January 1993 to October 2009 and Magma Design Automation, Inc., a publicly held company, from January 2004 to June 2005.

59.     Upon information and belief, Defendant Meyercord is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60.     By reason of their positions as officers, directors, and/or fiduciaries of Microchip and because of their ability to control the business and corporate affairs of

14

Microchip, the Individual Defendants owed Microchip and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Microchip in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Microchip and its shareholders so as to benefit all shareholders equally.

61.   Each director, officer, and controller of the Company owes to Microchip and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62.   The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controllers of Microchip, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.   To discharge their duties, the officers, directors, and controllers of Microchip were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of Microchip, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controllers of the Company has been ratified by the

remaining Individual Defendants who collectively comprised Microchip's Board at all relevant times.

65.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of Microchip were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Microchip were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Microchip's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Microchip conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Microchip and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Microchip's operations would comply with all applicable laws and Microchip's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67.    Each of the Individual Defendants further owed to Microchip and the shareholders the duty of loyalty requiring that each favor Microchip's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Microchip and were at all times acting within the course and scope of such agency.

69.     Because of their advisory, executive, managerial, directorial, and controlling positions with Microchip, each of the Individual Defendants had access to adverse, non-public information about the Company.

70.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microchip.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

73.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Microchip was a direct, necessary,

and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Microchip, and was at all times acting within the course and scope of such agency.

## MICROCHIP'S CODE OF CONDUCT

76.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[a]ll directors, officers, employees, and contractors of Microchip Technology Incorporated or any of its subsidiaries . . . (hereafter, "Covered Persons") are expected to read and understand this Code of Business Conduct and Ethics, uphold these standards in day-to-day activities, and comply with all applicable policies and procedures."

77.     The Code of Conduct provides that the purpose thereof is to "deter wrongdoing and promote":

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• *Full, fair, accurate, timely, and understandable disclosure of reports and documents that Microchip Technology Incorporated files with, or submits to, the SEC and in other public communications made by the Company*;

• Compliance with applicable governmental laws, rules, and regulations;

• Prompt internal reporting to an appropriate person or persons of violations of this Code of Business Conduct and Ethics; and

• Accountability for adherence to this Code of Business Conduct and Ethics.

(Emphasis added.)

78.     The Code of Conduct provides, regarding reporting violations thereof, that:

Part of your job and ethical responsibility is to help enforce this Code of Business Conduct and Ethics. ***You should be alert to possible violations of this policy and report possible violations of any Company policy*** to the Vice President of the Human Resources Department, the General Counsel, or the Chief Financial Officer, as appropriate.

* * *

As part of your commitment to ethical and legal conduct, ***the Company expects you to report suspected violations of this policy or of any applicable law, by any Covered Person***.

* * *

With regard to suspected violations of accounting or auditing policies or requirements, violations of federal or state securities laws or bribery of foreign officials, please see the Reporting Legal Non-Compliance Policy (HR-675). ***You are required to come forward with any such information about suspected violations of this Code of Business Conduct and Ethics without regard to the identity or position of the suspected offender***. The Company will treat the information in a confidential manner (except as necessary to conduct the investigation and take any remedial action, and in accordance with applicable law) and will seek to ensure that no acts of retribution or retaliation will be taken against anyone for making a report.

Because failure to report criminal activity can itself be understood to condone the crime, we emphasize the importance of reporting. Failure to report knowledge of wrong-doing may result in disciplinary action, civil or criminal liability, or a combination of all against those who fail to report.

(Emphasis added.)

79.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Six of the Individual Defendants violated the code by selling shares of Company stock during the Relevant Period while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and properly report violations of the Code of Conduct.

### MICROCHIP'S INSIDER TRADING POLICY

80.    The Company has adopted an insider trading policy. The policy provides, regarding the intent thereof, in relevant part, that:

**ANYONE WHO ENGAGES IN A TRANSACTION IN MICROCHIP SECURITIES OR THE SECURITIES OF OTHER PUBLIC COMPANIES ENGAGED IN BUSINESS OR IN A BUSINESS TRANSACTION WITH MICROCHIP OR ITS SUBSIDIARIES WHILE AWARE OF MATERIAL NON-PUBLIC INFORMATION MAY BE SUBJECT TO CIVIL AND CRIMINAL LIABILITIES AND PENALTIES, WHICH MAY INCLUDE DISGORGEMENT OF ANY PROFITS MADE OR LOSSES AVOIDED, FINES OR IMPRISONMENT, AS WELL AS DISCIPLINARY ACTION BY MICROCHIP.**

81.    With respect to trading with knowledge of material non-public information, the insider trading policy provides, in relevant part:

*If you are aware of any material non-public information relating to the Company* which may include information related to quarterly earnings or changes in analyst estimates or Company guidance, changes in control or senior management, significant mergers, acquisitions or divestitures, changes in dividend policy, changes in auditors or bankruptcy, regardless of how you obtained the information, *you, your immediate family, and anyone else living with you in your residence or living elsewhere but*

21

> ***under your economic control, must refrain from trading (buying or selling) the Company's securities either directly or indirectly***. It does not matter where or how the stock or other securities were originally acquired. The foregoing trading prohibitions cover all forms of transactions in the Company's securities, including limit orders, stop loss orders, puts, calls, and other derivative transactions. Additionally, dividend reinvestment programs (DRIP) and automatic sale programs (except with respect to certain trading plans under Rule 10b5-1(c) as described in Section 8 hereof) should be avoided as they can result in trades during blackout periods.

(Emphasis added.)

82. In violation of the insider trading policy, six of the Individual Defendants sold Company shares based on material, non-public information, obtaining an aggregate benefit of approximately $4 million. The majority of these transactions were conducted within a week of the announcement of the Microsemi acquisition.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### **Background**

83. Microchip describes itself as a leading provider of microcontroller, mixed signal, analog and Flash-IP solutions.

84. Microchip acquired Microsemi in a cash acquisition announced on March 1, 2018 and completed on or about May 29, 2018. Microchip paid approximately of $8.34 billion to acquire Microsemi, for a total value of $10.15 billion including net debt.

85. Microchip received due diligence from Microsemi in connection with the acquisition. As stated in a Form 14A filed with the SEC by Microsemi on April 19, 2018 (the "Microsemi Merger Proxy"):

> On February 2, 2018, Microsemi received a written due diligence request list from Microchip, and ***Microsemi provided Microchip with access to Microsemi's virtual data room. During the remainder of February 2018, Microsemi, Microchip and their respective advisors participated in diligence calls and Microsemi and its advisors responded to additional due diligence requests from Microchip and its advisors***.

1

2

* * *

3

From February 25, 2018 to March 1, 2018, O'Melveny and WSGR
continued to negotiate the terms of the merger agreement and Microchip
continued to conduct due diligence.

4

5

(Emphasis added.)

6

86.    The Microsemi Merger Proxy further asserted that Microchip had been

7

provided with financial projections, stating, in relevant part:

8

Although Microsemi has publicly issued limited short-term guidance
concerning certain aspects of its expected financial performance, it does
not, as a matter of course, make public disclosure of detailed forecasts or
projections of its expected financial performance for extended periods
due to, among other things, the uncertainty, unpredictability and
subjectivity of the underlying assumptions and estimates. However, in
connection with Microsemi's evaluation of strategic alternatives and a
possible business combination transaction involving Microsemi, in early
December 2017, Microsemi prepared certain projections and estimates of
future financial and operating performance with respect to Microsemi's
second, third and fourth quarters of fiscal year 2018, fiscal year 2019 and
fiscal year 2020 (which we refer to as the December 2017 management
projections), which it made available to the parties that had expressed
interest in a business combination with Microsemi at that time
(Microchip, Party B, Party C and Party D) as well as the Board and
Qatalyst Partners. In late January 2018, to account for changes in U.S.
tax laws and Microsemi's actual results for the first quarter of its fiscal
year 2018, Microsemi prepared updated financial projections and
estimates of future financial and operating performance for its
fiscal years 2018 through 2023, including the calendar year ending
December 31, 2018 (which we refer to as the January 2018 management
projections), which it made available to the Board and Qatalyst Partners.
A subset of the January 2018 management projections, consisting of
certain prospective financial information with respect to the second, third
and fourth quarters of fiscal year 2018, fiscal year 2019 and fiscal year
2020, was also made available to Microchip to assist with its due
diligence review.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

87.    Upon information and belief, the Individual Defendants caused the

27

Microsemi acquisition to be signed on March 1, 2018, in the absence of adequate due

28

diligence, so that the acquisition could be announced at the Company's Investor Day, held on March 1, 2018.

88.   During the Company's Investor Day presentation on March 1, 2018, Defendant Sanghi asserted that, "trying to have it land on the [investor] day, I signed [the Microsemi acquisition] deal one minute before market closed today 3:59 New York time. This was herculean task. We probably all lost some weight trying to get there."

89.   In the weeks following the March 1, 2018 announcement, and while the price of the Company's stock was artificially inflated due to the false and misleading statements alleged herein, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord, representing the entirety of the Company's Board during the Relevant Period, sold company shares on material inside information, in violation of the Company's insider trading policy, from which they benefitted in the aggregate amount of over $3.7 million.

90.   During the majority of the Relevant period, the Company's GAAP revenue and earnings reflected sales to distributors, while its non-GAAP revenue and earnings was reflective of sell through to customers. Defendant Sanghi was quoted in the Company's press release announcing its financial results for the quarter ended March 31, 2018, issued on May 8, 2018, as stating, in relevant part:

> ***Beginning April 1, 2018, we adopted the new GAAP revenue recognition standard which requires us to recognize revenue at the time products are sold to distributors*** whereas currently, revenue on such transactions are deferred until the product is sold by our distributor to an end customer. We are not able to provide guidance on a GAAP basis as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end-market demand. As evidence of this uncertainty, in recent years, we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter. ***Our non-GAAP revenue will be based on what we believe reflects true end-market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer***.

1   (Emphasis added.)

2       **<u>False and Misleading Statements</u>**

3       ***March 1, 2018 Press Release***

4       91.    After markets closed on March 1, 2018, the Individual Defendants

5   caused the Company to issue a press release announcing that Microchip would acquire

6   Microsemi. The timing of the announcement was designed to coincide with the

7   Company's Investor Day, held on March 1, 2015. The press release reported that the

8   two companies had signed a definitive agreement under which Microsemi would be

9   acquired for $68.78 per share, paid in cash. The press release quoted Defendant Sanghi

10  as stating, in relevant part:

11          Microchip continues to view accretive acquisitions as a key strategy to

12          deliver incremental growth and stockholder value. The Microsemi
        acquisition is the latest chapter of this strategy and will add further

13          operational and customer scale to Microchip

14

15      92.    The press release later asserted, "[f]ollowing the closing, the transaction

16  is expected to be immediately accretive to Microchip's non-GAAP earnings per

17  share."

18      93.    The press release quoted Defendant Moorthy as stating:

19          Microchip and Microsemi have a strong tradition of delivering

20          innovative solutions to demanding customers and markets, thus ***creating
        highly valued and long-lasting revenue streams***. Joining forces and

21          combining our complementary product portfolios and end market
        exposure will offer our customers a richer set of solution options to

22          enable innovative and competitive products for the markets they serve[.]

23

24  (Emphasis added.)

25      ***Investor Day 2018***

26      94.    Also on March 1, 2018, and following the issuance of the above-

27  mentioned press release, the Individual Defendants caused the Company to provide an

28  Investor Day presentation. During the presentation, Defendant Sanghi characterized

Microsemi as the "[f]irst company we're buying in our string of acquisitions, where their gross margin is higher than us." He also described the acquisition as, "strategically and financially, a very compelling transaction." Defendant Sanghi informed participants that Microsemi's sales were "about $1.875 billion annualized. A little higher gross margin, 63.2% and an operating income of 32.2%."

95.    Defendant Sanghi stated during the presentation that the Microsemi "deal is accretive on day one without doing anything, without any synergy."

96.    The Investor Day slides made a similar assertion, stating, in relevant part, that the Microsemi "[t]ransaction is expected to be immediately accretive to our non GAAP earnings per share." The section of the slide deck dealing with the Microsemi transaction concluded by characterizing the Microsemi acquisition as: "Another Compelling Transaction!" in large, bold letters and highlighted in bright yellow.

**May 29, 2018 Press Release**

97.    On May 29, 2018, the Company issued a press release titled "Microchip Technology Announces Completion of Microsemi Acquisition." The press release quoted Defendant Sanghi as stating:

> We are very pleased to have completed our acquisition of Microsemi . . . I welcome the Microsemi employees into the Microchip family and look forward to working together to realize the benefits of a combined team pursuing a unified strategy. ***The Microsemi acquisition will significantly enhance our product portfolio, end-market diversification, operational capabilities and customer scale***.

(Emphasis added.)

98.    Regarding the financial effect of the transaction, the press release stated that it "is expected to be immediately accretive to Microchip's non-GAAP earnings per share.  Short term, we're targeting 18% growth in non-GAAP EPS from fiscal year '18 to fiscal year '19, with accretion from Microsemi and continuous improvement and growth in our own business. "

1

***May 31, 2018 Press Release***

2
     99.    On May 31, 2018, the Company issued a press release titled "Microchip

3
Technology Provides Updated Guidance After Completion of Microsemi Acquisition."

4
The press release stated, in relevant part:

5
        Microchip    Technology    Incorporated,    a    leading    provider    of

6
        microcontroller, mixed signal, analog and Flash-IP solutions, today
provided updated guidance for net sales and non-GAAP earnings per

7
        share for its fiscal first quarter of 2019 ending June 30, 2018, after the

8
        completion of the acquisition of Microsemi Corporation by Microchip.
Microchip previously provided guidance on May 8, 2018 for

9
        consolidated non-GAAP net sales to be up between 1% and 6%

10
        sequentially with a mid-point of up 3.5%. Microchip expects non-GAAP
net sales based on end market demand from Microsemi to add between

11
        $160 million to $180 million to its June quarter results, and now expects

12
        consolidated non-GAAP net sales for the June quarter to be up 17% to
24% sequentially. ***Microchip expects Microsemi to add between 2 cents***

13
        ***to 6 cents to non-GAAP earnings per share. The combined non-GAAP***

14
        ***earnings per share for Microchip and Microsemi is expected to be***
***between $1.41 and $1.55 per share. The original guidance for Non-***

15
        ***GAAP earnings per share was between $1.39 and $1.49 per share***.

16
        Microchip is not able to provide an estimate of its GAAP earnings per
share at this time but will report its GAAP results and provide

17
        reconciliations of its GAAP and Non-GAAP results with its earnings
release in early August 2018.

18
(Emphasis added.)

19
     100.    The press release quoted Defendant Sanghi as stating, in relevant part:

20

21
        We completed our acquisition of Microsemi on May 29, 2018 and are
excited about the future of the combined companies with our expanded

22
        product portfolio, end-market diversification, operational capabilities and

23
        customer scale . . . ***Our combined teams are now laser focused on***
***delivering the synergies we identified, and to achieve the accretion***

24
        ***targets*** which will enable us to rapidly start reducing our leverage.

25
(Emphasis added.)

26
***2ⁿᵈ Annual Needham Automotive Tech Day***

27
     101.    On June 4, 2018, Defendant Moorthy presented at the 2nd Annual

28
Needham Automotive Tech Day ("Needham") on behalf of the Company. The slide

deck presented at Needham stated the following with respect to the Microsemi transaction: "Expect Microsemi to add $160M to $180M non-GAAP revenue in FQ1'19 [the quarter ended June 30, 3018], and non GAAP-EPS of $0.02 to $0.06."

### *Bank of America Merrill Lynch 2018 Global Technology Conference*

102.    On June 6, 2018, Defendant Bjornholt presented at the Bank of America Merrill Lynch 2018 Global Technology Conference ("BofA Conference") on behalf of the Company. The slide deck presented at the BofA Conference stated the following with respect to the Microsemi transaction: "Expect Microsemi to add $160M to $180M non-GAAP revenue in FQ1'19, and non GAAP-EPS of $0.02 to $0.06."

103.    The slide deck presented at the BofA Conference further asserted, with respect to the Microsemi acquisition, that:

- ***Transaction is expected to be immediately accretive to our non GAAP earnings per share***

- Short term: Targeting 18% growth in non-GAAP EPS from FY18 to FY19 with accretion from Microsemi (assumes June 2018 close)

  - o  Microsemi adds ~75 cents of non-GAAP EPS accretion annualized run rate in the first year after close

(Emphasis added.)

104.    The statements in ¶¶ 91-103 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Microsemi acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that such acquisition would be "immediately accretive"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks; (3) the Company failed to maintain internal controls; and (4) due to the

28

foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### 2018 Proxy Statement

105.    The Company filed its 2018 Proxy Statement with the SEC on July 12, 2018. Defendants Sanghi, Chapman, Day, Johnson, and Meyercord solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

106.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> In May 2004, our Board of Directors adopted a Code of Business Conduct and Ethics for our directors, officers (including our chief executive officer and chief financial officer), and employees. A copy of the Code of Business Conduct and Ethics, as amended to date, is available on our website at the About Us/Investor Relations section under Mission Statement/Corporate Governance on *www.microchip.com.*

> We intend to post on our website any amendment to, or waiver from, a provision of our code of ethics within four business days following the date of such amendment or waiver or such other time period required by SEC rules.

107.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by six of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

108.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity compensation designed to "align [executive officers'] collective interests with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

109.    The 2018 Proxy Statement also failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Microsemi acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that such acquisition would be "immediately accretive"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### ***The Truth Begins to Emerge***

110.    On August 9, 2018, the Company issued a press release titled "Microchip Technology Announces Financial Results for the First Quarter of Fiscal Year 2019." This fiscal period included one month of post-Microsemi acquisition operating results. The press release quoted Defendant Sanghi as stating:

> Since our acquisition of Microsemi Corporation on May 29, 2018, we have been actively engaged in further understanding the opportunities and challenges of this business. While we have lots of work to do to achieve our long-term financial targets, we have high confidence in our team's ability to achieve these results over time.

111.    After markets closed on August 9, 2018, the Company held an earnings call with analysts and investors to discuss its financial results for the quarter ended

June 30, 2018. During the call, Defendant Bjornholt stated the following regarding the Company's revenue recognition practices:

> I want to remind investors that during the quarter ending June 30, 2018, we adopted a new GAAP revenue recognition standard, which requires revenue to be recognized at the time products are sold to distributors versus our historical revenue recognition policy, where revenue on such transactions were deferred until the product was sold by our distributors to an end customer. We are not able to provide guidance on a GAAP basis, as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end market demand, as this is not how we manage our business. As evidence of this uncertainty, in recent years we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter. Our non-GAAP revenue is based on true end market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer. We will continue to manage our business and distributor relationships based on creating and fulfilling end market demand. All of Microchip's bonus programs will continue to work based on the amount of revenue earned from fulfilling market demand. Therefore, along with GAAP results based on sell-in, we will also report our non-GAAP results based on sell-through revenue recognition.

112.    Regarding the Company's inventory, Defendant Bjornholt stated, in relevant part:

> Moving on to the balance sheet, our inventory balance at June 30, 2018 was $1.105 billion, including $359.7 million of inventory mark-up from Microsemi required for GAAP purchase accounting. Excluding the inventory mark-up, we had 119 days of inventory at the end of the June quarter. Our targeted inventory levels are between 115 and 120 days. Inventory at our distributors in the June quarter were at 40 days compared to 36 days at the end of March. The ***historical Microchip distributor inventory was actually down by about a day in the June quarter but the consolidated increase is driven by the high inventory in the Microsemi distribution channel. We expect the Microsemi distribution inventory to reduce through the end of calendar year 2018***.

(Emphasis added.)

113.    Defendant Sanghi provided commentary on the Microsemi acquisition, specifically inventory levels in the distribution channel. Defendant Sanghi stated, in

relevant part:

> In the case of Microsemi, **we found that Microsemi management was extremely aggressive in shipping inventory into the distribution channel**. Microsemi's distributors had about four months of inventory, whereas Microchip's distributors carry about two and a half months of inventory. While we have seen some excess shipments of inventory into the distribution channel in other acquisitions, **we have never seen as much excess as we found in the case of Microsemi**. Microsemi also always shipped into the contract manufacturers by making deals and offering discounts. **_This excessive distribution in contract manufacturers' inventory will provide some headwind for revenue for the next couple of quarters. Our trailing EBITDA and the next two quarters of cash generation will also be impacted by needing to correct this inventory for Microsemi products_**.

(Emphasis added.)

114.    Regarding the spending culture at Microsemi, Defendant Sanghi stated, in relevant part:

> We also found a culture of excessive extravagance and high spending. The company had millions of dollars of sponsorships and several luxury suites in sports stadiums, luxury private plane travel, and generous sponsorships for many conferences, stadiums, and other venues that are a waste of shareholders' money. We are undoing commitments to all such spending.

115.    Defendant Sanghi outlined the following steps that the Company was taking to resolve the above issues, stating, in relevant part:

> So what are we doing to clean up our excess inventory and other spending? We did not make any deals with the distribution, contract manufacturers, or end customers in the month of June to ship excess inventory. As a result**_, we shipped close to $100 million less in the month of June than Microsemi's ex-management would have shipped_**. That was nearly half the inventory correction accomplished in a single month. We expect to achieve the balance of the distribution inventory correction in the next two quarters and nearly complete the correction by the end of this calendar year.

Based on high inventory in distribution, as well as inside Microsemi, we have substantially cut back on the manufacturing build plan in internal factories, as well as foundries and assembly test subcontractors. The vast majority of Microsemi business is subcontracted so we will see a dollar-for-dollar cash saving, which will offset the negative cash impact of -- some of the negative cash impact of inventory correction.

116.    Defendant Sanghi engaged in the following discussion with an analyst regarding Microsemi's aggressive sales practices:

**William Stein** -- *SunTrust Robinson Humphrey -- Analyst*

Thanks. And as a follow-up, I just want to make sure I understand the discussion point around Microsemi's having stuffed not only the distribution channel but other sort of channels, including, it sounds like, direct customers as well. And when we marry that up with Microchip's approach to rev rec, which is sell-through, the reduction in inventory in the channel, that doesn't actually reduce your non-GAAP revenue. Maybe perhaps a shortfall in your outlook on the revenue side is more driven by the reductions in inventory perhaps at contract manufacturing and other direct customers, but not what's going to distribution. Is that the right way to think about it?

**Steve Sanghi** -- *Chairman and Chief Executive Officer*

Well, good question. Very good question. That would be the case if everything was pure. But everything was not pure. They had also -- ***ex-management had also taken -- every quarter, they would take some direct customers and move them to distribution by giving distribution some discount so they could make a margin on it. And in doing so, they would take the next couple of quarters of product for that customer and stuff them into distribution***. So, therefore, you get to recognize higher sell-in revenue because, to the end customer, you only ship 1x, but to the distributor, you can give them 1.5x or 2x. And they would do some of that every quarter. ***So there was, overall, more than a couple hundred million dollars of direct accounts had been moved to distribution over the last year or so***. And you can't totally put your finger on it but a lot of that seemed to coincide when it was sort of decided when the company would be sold. There is some timeline you can triangulate to. It's not something I can really prove.

\* \* \*

33

Therefore, there is inventory sitting in distribution for the direct customers. And ***those direct customers, we are converting them back to direct customers but they won't be buying anything for a little while until the distribution has cleared out their inventory***, shipping it to the direct customers.

(Bolded names and italicized titles in original of transcript. Emphasis added in bold & italics.)

117.    In response to another analyst's question about revenue recognition at Microsemi, Defendant Sanghi stated, in relevant part:

So ordinarily a management team, in managing the business, will ship to distribution roughly what distribution ships out and have the distribution inventory grow only by the amount of distribution shipping amount, in terms of business growing. That's not really what happened here, hiding under the revenue recognition that sell-in is a revenue recognition. There were a large number of deals made with the distribution. When the inventory got higher and higher, they even offered interest subsidy to the distributor to carry inventory beyond a certain number of months, because the distributor wouldn't want to carry -- he has his money tied up. And they would off interest subsidy. So basically shipping to distribution was made an art form almost. So, yes, the revenue was higher than the real end market demand.

Now, at this point in time, we're not totally prepared to give you that number. I think it's not extremely large. It's in a few percentage range. But we need to clear out this inventory over the next one or two quarters and, ourselves, be comfortable with what the run rate is. There will be, as we clean out this inventory over the next couple of quarters, there will be a larger revenue increase as we head toward the full board shipment, because inventory correction is over. So there will be some attenuation out in time of the growth rate, and I think we'll provide you some guidance over time, but not today.

118.    Defendant Sanghi provided the following color on Microsemi's sales practices, stating: "inventory was jammed through incentives and discounts and, to smaller distributors, even threatening." Regarding the effect of these sales practices, he further noted that "there are products in distribution from Microsemi that will take two years to clear."

119.   In response to a question regarding the timing of channel stuffing by Microsemi, Defendant Sanghi stated:

> Well, there are a lot of moving parts and you can't put a complete finger on it because there is some EOL mechanism with which they put the distribution inventory. Normal amount of inventory was very high. There was a huge non-linearity. A lot of stuff was shipped undetermined. There was also this direct to distribution conversion. So there were a lot of these programs interlayered. And I'm not accusing anything but I'm just saying that the timing, roughly, it all started about a year or so ago, which is more like when the conversations about the acquisition began. But I couldn't prove that. I think it's very, very rough.

> **Christopher Rolland** -- *Susquehanna International Group -- Analyst*

> Yeah. ***Sounds pretty common in a lot of these deals.***

(Bolded names and italicized titles in original of transcript. Emphasis added in bold & italics.)

120.   Defendant Sanghi noted that Microchip and Microsemi had distributors in common, and that Microsemi's channel stuffing had worn on its relationship with distributors, stating, in relevant part:

> So, as we have interfaced with a lot of the distributors -- some of them, by the way, a fair number of them are common with Microchip. The largest distributor was Arrow Electronics and our largest distributor is Arrow Electronics. And similarly there are some other common distributors in Asia and Japan and Europe and others. A large amount of interaction with the distributors was how much inventory they would take. Basically, beginning around the middle of the quarter -- and large amount of, I would say, tension with the distributor was largely how much inventory would you take.

> And so, as we have spoken with the distributors, distributors feel refreshed and seeing that you're not going to force me to take inventory that I never wanted. You will, in fact, let me drain down my inventory. And so we can have a conversation about demand creation, reference design, how can we together build the business, let's go call on common customers, let's highlight and beef up the website and put reference designs and solutions on it. How do we take advantage of Total Systems Solution, Microchip and Microsemi common products going into the

same platform? On and on and on. So conversations with distributors have turned into positive interactions regarding growing the business. And before that -- and this is distributors telling us. The ex-management of Microsemi is gone. Distributors are telling us that this tension about such a large amount of inventory jamming took all the oxygen out of the room. It just consumed the entire energy and interaction with the distributors.

121.    As a result of these shared distributors, the Individual Defendants should have been able to discover the Microsemi's aggressive sales practices leading up to Microchip's acquisition of Microsemi. Indeed, Christopher Rolland of Susquehanna International Group characterized such behavior as "pretty common" in similar business combinations during the August 9, 2018 conference call.

122.    During the August 9, 2018 conference call, Defendant Sanghi stated that "we expect total non-GAAP net revenue in the September quarter to be between $1.474 billion to $1.55 billion." This was below the revenue for the quarter ended September 30, 2018 of $1.59 billion projected by analysts based on the Company's prior public statements prior to August 9, 2018.

123.    Analysts pointed to Microsemi's channel stuffing as the source of the revenue shortfall. As an analyst from JP Morgan asserted:

We believe that 70% of the miss was from [Microsemi] and attributed to [Microsemi] distribution channel stuffing which implies that true end demand revenue was well below what [Microsemi] had been reporting over the last few quarters. As a result, [Microsemi] had inflated revenues leading up to the acquisition (sell-in revenue recognition).

124.    On this news, the price per share of Microchip's public stock fell $10.67, or nearly 11%, from their closing price on August 9, 2018 to close at $97.41 on August 10, 2018.

125.    On November 7, 2018, the Company issued a press release announcing its financial results for the quarter ended September 30, 2018. The press release reported net sales of $1.513 billion, just above the $1.512 billion midpoint of guidance provided on August 9, 2018.

36

## DAMAGES TO MICROCHIP

126.    As a direct and proximate result of the Individual Defendants' conduct, Microchip has lost and will continue to lose and expend many millions of dollars.

127.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its Chairman and CEO, and its President and COO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

128.    Such expenditures include, but are not limited to, legal fees associated with the Slander Action filed against the Company, its Chairman and CEO, its President and COO, its CFO and Vice President, and its Vice President, Worldwide Sales & Applications, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

130.    As a direct and proximate result of the Individual Defendants' conduct, Microchip has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

131.    Plaintiff brings this action derivatively and for the benefit of Microchip to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Microchip, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

132.    Microchip is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.    Plaintiff is, and has been at all relevant times, a shareholder of Microchip. Plaintiff will adequately and fairly represent the interests of Microchip in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

135.    A pre-suit demand on the Board of Microchip is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five Individual Defendants: Defendants Sanghi, Chapman, Day, Johnson, and Meyercord (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

136.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while all five of them engaged in insider sales based on material non-public information, all of which occurred shortly after the announcement of the Microsemi acquisition, netting proceeds of over $3.7 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

137.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138.   The Directors knew of the falsity of the misleading statements at the time they were made, or acted with reckless indifference in failing to be aware of their falsity. The acquisition of Microsemi was highly material to core operations of Microchip. The Microsemi acquisition was, at the time of the acquisition, projected to increase the Company's annual revenues by 50%--from $4 billion to $6 billion per year.

139.   As Board members of Microchip, charged with overseeing the Company's affairs, Directors Sanghi, Chapman, Day, Johnson, and Meyercord all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Microchip, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord must have been aware of, or recklessly disregarded, the material facts surrounding the acquisition of Microsemi, including the results of due diligence, and any deficiencies in the due diligence process.

140.   As alleged the Slander Action, Microsemi provided the Company with unfettered access to a "Data Room" containing 15.3 gigabytes of information including confidential financial and operational information. That suit alleges that "[u]pon information and belief, Microchip and its attorneys wholly neglected to access a large portion of the information and documents in the Data Room prior to the [c]losing" of the Microsemi acquisition.

141.   Indeed, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord were motivated by hubris and greed to sign the Microsemi acquisition agreement in time to announce the deal at the Company's March 1, 2018 Investor Day. By getting the deal signed by that deadline, the Directors increased exposure for the acquisition, enhancing any increase to the Company's stock price in reaction to the announcement. This allowed each of the Directors to make lucrative insider sales of Company stock at artificially inflated prices over the following two weeks. As Defendant Sanghi himself

admitted at the Investor Day conference, he "signed [the Microsemi acquisition] deal one minute before market closed today 3:59 New York time. This was herculean task."

142.    Therefore, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements and omissions were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

143.    Further, the Directors breached their fiduciary duties by failing to ensure that adequate due diligence was conducted with respect to the Microsemi acquisition, instead rushing the signing of the deal to enable them to announce it at the March 1, 2018 Investor Day conference and subsequently obtain personal benefits by trading Company shares on material inside information.

144.    Additional reasons that demand on Defendant Sanghi is futile follow. Defendant Sanghi has served as a Company director since 1990, as the Company's CEO since 1991, and as the Company's Chairman since 1993. Thus, as the Company admits, Defendant Sanghi is a non-independent director. He receives handsome compensation, including nearly $7.9 million in the fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Microsemi acquisition, and which yielded approximately $1.9 million in proceeds, demonstrates his motive in facilitating and participating in the scheme. As the Company's CEO and Chairman, Defendant Sanghi had a duty to ensure that adequate due diligence was conducted with respect to the Microsemi acquisition. As a long-time Company Chairman and CEO, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Sanghi personally made many of the false statements and omissions of material fact that are alleged herein, including in press releases and conference calls. He also solicited the 2018 Proxy Statement, which

contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Sanghi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Chapman is futile follow. Defendant Chapman has served as a Company director since 1997, and is the Chair of the Audit Committee. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Microsemi acquisition, and which yielded approximately $564,492 in proceeds, demonstrates his motive in facilitating and participating in the scheme. As a long-time Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Chapman solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Chapman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Day is futile follow. Defendant Day has served as a Company director since 1994. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transactions before the fraud was exposed, made less than a week after the announcement of the Microsemi acquisition, and which yielded approximately $570,720 in proceeds, demonstrate his motive in facilitating and participating in the scheme. As a long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and

engagement in the scheme. Defendant Day solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Day breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Meyercord is futile follow. Defendant Meyercord has been a Company director since 1999, and is a member of the Audit Committee. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Microsemi acquisition, and which yielded approximately $474,590 in proceeds, demonstrates his motive in facilitating and participating in the scheme. As a long-time Company director, and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Meyercord solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Meyercord breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has been a Company director since 2013, and is a member of the Audit Committee. She receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. Her insider transaction before the fraud was exposed, made within two weeks of the announcement of the Microsemi acquisition, and which yielded approximately $222,732 in proceeds, demonstrates her motive in facilitating and participating in the scheme. As a trusted Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement

in the scheme to make false and misleading statements, and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Defendant Johnson solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.   In violation of the Code of Conduct, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Directors engaged in insider sales of Microchip stock during the Relevant Period, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

150.   Microchip has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Microchip any part of the damages Microchip suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

151.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the

Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

152.   The acts complained of herein constitute violations of fiduciary duties owed by Microchip's officers and directors, and these acts are incapable of ratification.

153.   The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Microchip. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Microchip, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

154.   If there is no directors' and officers' liability insurance, then the Directors will not cause Microchip to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

155.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

# FIRST CLAIM

## Against Individual Defendants for Violations of
## Section 14(a) of the Exchange Act

156.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

158.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

160.   Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Microsemi acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that

such acquisition would be "immediately accretive"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

161.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

162.    The 2018 Proxy Statement also made reference to the Company's Code of Conduct. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, and not engage in insider trading. By issuing false and misleading statements to the investing public and insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct were being violated.

163.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

164.   The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Sanghi, Chapman, Day, Johnson, and Meyercord, which allowed them to continue breaching their fiduciary duties to Microchip.

165.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

166.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Microchip's business and affairs.

168.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Microchip.

170.   In breach of their fiduciary duties owed to Microchip, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Microsemi acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that such acquisition would be "immediately accretive"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the acquisition, including the amount of inventory in the channel, or its spending on promotions and executive

47

perks; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

171.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

172.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, six of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

173.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

174.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microchip's securities, and disguising insider transactions.

175.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the

fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microchip's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

176.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microchip has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.   Plaintiff on behalf of Microchip has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

179.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microchip.

181.   The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Microchip that was tied to the performance or artificially inflated valuation of Microchip, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

182.   Plaintiff, as a shareholder and a representative of Microchip, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other

compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

183.    Plaintiff on behalf of Microchip has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Microchip, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Microchip;

(c)    Determining and awarding to Microchip the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Microchip and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Microchip and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Microchip to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

1           (e)    Awarding Microchip restitution from Individual Defendants, and

2    each of them;

3           (f)    Awarding Plaintiff the costs and disbursements of this action,

4    including reasonable attorneys' and experts' fees, costs, and expenses; and

5           (g)    Granting such other and further relief as the Court may deem just

6    and proper.

7    **<u>JURY TRIAL DEMANDED</u>**

8    Plaintiff hereby demands a trial by jury.

9

10   Dated:  December 17, 2018.

11

12   **TIFFANY & BOSCO, P.A.**

13

14   By:   */s/ Richard G. Himelrick*

       Richard G. Himelrick

15          Seventh Floor Camelback Esplanade II

       2525 East Camelback Road

16          Phoenix, AZ 85016

17          *Liaison Counsel for Plaintiff*

18   **THE ROSEN LAW FIRM, P.A.**

       Phillip Kim

19          275 Madison Avenue, 34th Floor

       New York, NY 10016

20

21   **THE BROWN LAW FIRM, P.C.**

       Timothy W. Brown

22          240 Townsend Square

23          Oyster Bay, NY 11771

       *Counsel for Plaintiff*

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on December 17, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*s/ Shelley Boettge*
Shelley Boettge

## VERIFICATION

I, Mark Kistenmacher am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ⅄th day of December 2018.

Mark Kistenmacher

HECTOR L. MELENDEZ
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires July 28, 2019