1

**TIFFANY & BOSCO, P.A.**
Richard G. Himelrick, State Bar No. 004738

2

Seventh Floor Camelback Esplanade II
2525 East Camelback Road

3

Phoenix, Arizona 85016
Telephone: (602) 255-6000

4

Email:  rgh@tblaw.com
*Liaison Counsel for Plaintiff*

5

**THE ROSEN LAW FIRM, P.A.**

6

Phillip Kim
275 Madison Avenue, 34th Floor

7

New York, NY 10016
Telephone: (212) 686-1060

8

Email: pkim@rosenlegal.com

9

**THE BROWN LAW FIRM, P.C.**
Timothy Brown

10

Stuart J. Guber
240 Townsend Square

11

Oyster Bay, New York 11771
Telephone: (516) 922-5427

12

Email:  tbrown@thebrownlawfirm.net
*Counsel for Plaintiff*

13

14

UNITED STATES DISTRICT COURT

15

DISTRICT OF ARIZONA

16

| | |
|---|---|
| Mark Kistenmacher, derivatively on behalf of Microchip Technology Incorporated, | Case No. 2:18-cv-04720-JJT |

17

18

| | |
|---|---|
| Plaintiff, | **VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |

19

20

| | |
|---|---|
| v. | **(DEMAND FOR JURY TRIAL)** |

21

Stephen Sanghi; Ganesh Moorthy; James
Eric Bjornholt; Matthew W. Chapman;

22

L.B. Day; Esther L. Johnson; and Wade F.
Meyercord,

23

24

Defendants,

25

and

26

Microchip Technology Incorporated,

27

28

Nominal Defendant.

## INTRODUCTION

Plaintiff Mark Kistenmacher ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Microchip Technology Incorporated. ("Microchip" or the "Company"), files this Verified First Amended Shareholder Derivative Complaint against Individual Defendants Stephen Sanghi, Ganesh Moorthy, James Eric Bjornholt, Matthew W. Chapman, L.B. Day, Esther L. Johnson, and Wade F. Meyercord (collectively, the "Individual Defendants" and together with Microchip, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Microchip, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: (i) a review of the Defendants' public documents, conference calls and announcements made by Defendants; (ii) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Microchip; (iii) news reports, securities analysts' reports and advisories about the Company, (iv) legal filings including but not limited to those in *Peterson v. Sanghi,* No. 8:18-cv-2000-JLS (ADSx) (C.D. Cal.) (the "Slander Action") and *Jackson v. Microchip Technology, Inc., et al,* Case No. 2:18-cv-02914-JJT (D. Ariz.) (the "Securities Class Action"); and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Microchip's directors and officers from March 1, 2018 through the present (the "Relevant Period") that has caused substantial damage to the Company. The gravamen of the wrongdoing involved: (a) overpaying and incurring in excess of $8

billion in new debt in the acquisition of Microsemi Corp. ("Microsemi") by Microchip in an all cash transaction (the "Acquisition") and the recklessly performed due diligence by the Individual Defendants in violation of their fiduciary duties in connection with the Acquisition; (b) materially false and misleading statements issued or permitted to be issued by the Individual Defendants concerning the Acquisition, subjecting the Company to potential liability in the Securities Class Action; (c) issuing a false and misleading proxy statement in violation of the federal securities laws; and (d) the insider trading of all five of the Company directors and a sixth who is a member of senior management at artificially inflated per share prices with knowledge and/or reckless disregard of the nonpublic adverse information concerning Microsemi's excess inventory at the distributorship level. This excess inventory, which Microchip would need to reduce, was caused by Microsemi's historic practice of selling inventory to distributors (and end users) at discounted prices in excess of their current needs at quarter end, which ultimately detrimentally impacts sales going forward.

2.      The practice by Microsemi of mortgaging future sales to increase current sales is commonly referred to as channel stuffing. When Microsemi's inventory levels and the effect that reducing those levels would have on Microchip's present and future financial performance were disclosed after the market closed on August 9, 2018, the Company's stock price immediately fell by almost 11% per share by the close of the market on August 10, 2018. The Individual Defendants were well aware of the importance of knowing Microsemi's distributor inventory and sales practices based on prior experience and their own financial reporting disclosure process, which in stark contrast to Microsemi's limited disclosure of only distributor sales, emphasized transparency that publicly reported both sales to distributors and end users, a more accurate portrayal of a Company's financial performance. There is no excuse for the Individual Defendants' due diligence failures, lack of full, fair and adequate disclosure and insider trading activities.

3.      Microchip develops, manufactures, and sells semiconductor products for various embedded control applications. At all relevant times hereto and to date, the Company has had the same five directors: Individual Defendants Steve Sanghi ("Sanghi"), who doubles as Chief Executive Officer (since 1991) and Chairman of the Board (since 1993); L. B. Day ("Day"), a director for over 24 years (since 1994); Matthew W. Chapman ("Chapman"), a director for over 22 years (since 1997); Wade E. Meyercord, a director for over 20 years (since 1999); and Esther L. Johnson, a director for over 5 years (since 2013).

4.      After markets closed on March 1, 2018, Microchip announced the signing of a definitive agreement to acquire Microsemi, a designer and manufacturer of semiconductors. Pursuant to the Acquisition, Microchip would acquire all outstanding common shares of Microsemi for $68.78 per share in cash plus assumption of $1.8 billion in Microsemi's net debt for a total enterprise value of $10.15 billion, which was to be financed by cash on hand plus an additional $8.6 billion in new debt.

5.      Investors and stock analysts had previously expressed concern over Microchip's ability to handle the increased debt that an all cash transaction would require. Just two days before, on February 27, 2018, Bloomberg Intelligence, Baron's Tech-Trader Daily Blog and Morgan Stanley all issued reports raising concerns over the anticipated new debt that would be needed to consummate the Acquisition. Defendants assured the investing marketplace that although the cost of the Acquisition was substantial, the new debt would be paid quickly through free cash generated by the combined entities. The Company press release announcing the Acquisition asserted that "[f]ollowing the closing, the transaction is expected to be immediately accretive to Microchip's non-GAAP earnings per share."[1] Increased free cash flow to quickly pay

---

[1] According to securedocs.com, the reason "an accretive acquisition adds value to the acquiring company's earnings is usually because the target company, perhaps a smaller entity, will have higher earnings per share as compared to the acquiring company. As a result, when the lower and higher earnings per share are combined, the final earnings

down the debt incurred in the Acquisition; increased earnings per share by the combined entities. The investing public was delighted.

6.    The price per share of Microchip common stock reacted favorably to the announcement, closing at $91.29 on March 2, 2018, an increase of $2.27, or 2.5% from its closing price on March 1, 2018. Microchip common stock continued to increase over the following six trading sessions closing at a March 2018 high of $100.24 per share on March 12, 2018, and closing higher than the previous trading day's close on all but one day between March 1 and March 12, 2018.

7.    In the two weeks following the announcement of the Microsemi transaction, and while the price of Microchip common stock was artificially inflated due to the false and misleading statements about the Acquisition as alleged herein, all five of the Company's directors sold Microchip shares on inside information. Three of those directors sold substantial portions of their personal holdings of Company stock within two weeks of the March 1, 2018, announcement of the Acquisition. Defendant Day sold 35% of his personal holdings on March 7, 2018, Defendant Chapman sold over 20% of his personal holdings on March 7, 2018 and Defendant Johnson sold over 27% of her personal holdings on March 14, 2018.

8.    On May 29, 2018, the Company announced that it had completed the acquisition of Microsemi at a price of $68.78 per share, paid in cash. Beginning on May 29, 2018, the actual cash flow generated by the Acquisition turned out to be approximately $110 million less than previously represented during the March 1, 2018 to August 9, 2018 class period in the Securities Class Action (the "Class Period"). According to the Individual Defendants, this was caused by Microsemi's channel stuffing activities that caused excess inventory that would need to be reduced by distributors and end users.

per share should be higher, provided that the cost to purchase the entity was low enough to create this net gain." Tara Naughter, What is an Accretive Acquisition?, Securedocs (Nov. 14, 2017), https://www.securedocs.com/blog/what-is-an-accretive-acquisition.

9.      By March 1, 2018, the due diligence conducted by the Individual Defendants would have revealed that Microsemi's distributors were holding excess inventory that would need to be reduced to be consistent with the Company's sales and financial reporting practices. The Individual Defendants would also have known that the cash generated by Microsemi product sales to distributors would be far less than represented to shareholders.

10.     The due diligence conducted by the Individual Defendants also would have revealed that towards the end of each quarter Microsemi also stuffed the channels with unwanted product on end users and that those inventories would need to be reduced.

11.     Inventory levels was something that the Individual Defendants considered very important in connection with their due diligence prior to the Acquisition. The Individual Defendants discussed in SEC filings, press releases, earnings conference calls and investor presentations the Company's own inventory levels, inventory levels at distributors and sales at both the distributor and end user, which gave a more accurate portrayal of a company's financial performance. These metrics were at the heart of the Company's business model and financial reporting disclosures.

12.     Specifically, Microchip recognized revenue on directs sales to distributors as required by Generally Accepted Accounting Principles ("GAAP") and disclosed those sales publicly. Non-GAAP "sell-through" net sales to end users was the more important metric to the Individual Defendants and investors, and those non-GAAP revenue figures were also publicly disclosed. Both prior to and throughout the Relevant Period the Individual Defendants managed the Company on a "sell-through revenue" basis, not "sell-in" (sales to distributors).

13.     In stark contrast to the Company, Microsemi did not publicly report inventory levels at distributors or sell-through sales to end users. Rather, Microsemi reported only sell-in (sales to distributors). With the importance that the Individual Defendants placed on inventory levels and end user revenue metrics, they would have had to have known the inventory levels at Microsemi distributors as part of their due

diligence and how that excess inventory would negatively impact both distributor and end user revenue, and would lower free cash flow going forward, resulting in the inability to pay down the substantial debt incurred in the Acquisition as represented publicly.

14.     The failure of Microsemi to disclose non-GAAP revenue and distributor inventory levels was a red flag to the Individual Defendants, who considered these metrics of paramount importance. In fact, the Individual Defendants had already experienced inventory issues and the detrimental impact therefrom on the Company's financial results in connection with the acquisition of Atmel Corporation ("Atmel"), which also failed to disclose sales to end users and distributor inventory levels. Thus, the Individual Defendants had a heightened sensitivity to inventory issues. It begs credibility that, given the importance that the Individual Defendants placed on the end user revenue figures and inventory levels and their previous experience in the Atmel acquisition, they would not have conducted substantial due diligence on those metrics prior to consummating the $10.3 billion Acquisition, especially where they were saddling the Company with another $8.6 billion in debt..

15.     Further, to aid the Individual Defendants in their due diligence in connection with the Acquisition, Microsemi set up a data room where all material facts concerning Microsemi's operations were available including inventory and end user data. Microsemi management also made themselves available to the Individual Defendants throughout the due diligence process both prior to March 1, 2018 and through their termination in late May 2018.

16.     The Individual Defendants knowingly or recklessly chose to ignore the information. This is the only plausible reason for experienced business people such as the Individual Defendants to cause the Company to incur $8.6 billion in debt without knowing the amount of inventory in the channel and cash to be generated by Microsemi post-Acquisition. Any other excuse is nonsensical.

17.     After markets closed on August 9, 2018, a little over two months after the Acquisition closed, the Company issued a press release announcing its financial results for the quarter ended June 30, 2018 and held a conference call to discuss that quarter's earnings on the same day. During the earnings call, the Company revealed that, for approximately a year prior to its acquisition of Microsemi, Microsemi had engaged in aggressive practices aimed at increasing revenue by incentivizing customers and distributors to accept more product than they were able to sell. It was reported that Microsemi had over four months of inventory in its channel. According to the Individual Defendants, Microsemi's aggressive sales practices allegedly went undetected during the due diligence process.

18.     Microsemi's sales practices had a negative impact on revenue for the quarter ended June 30, 2018 and generated $110 million less of net free cash flow and higher debt leverage. Microsemi's sales practices were projected by the Individual Defendants to have a negative impact on the Company's revenue for the balance of calendar year 2018. Microchip sold over $200 million less of Microsemi product to distributors and end users in the quarters ended June 30, 2018 and September 30, 2018.

19.     On the August 9, 2018 news, the price per share of Microchip stock declined from a close of $98.08 per share on August 9, 2018 to close at $87.41 per share on August 10, 2018 -- a drop of almost 11%, or $10.67. A number of securities class actions followed, which were later consolidated into the Securities Class Action.

20.     Throughout the Class Period in the Securities Class Action, the investing public was under a false impression of the Company's business, operations, and financial success.

21.     In breach of their fiduciary duties, the Individual Defendants caused the Company to overpay and incur in excess of $8 billion in new debt in the Acquisition and failed to do the requisite due diligence in connection with the Acquisition, or did it but deliberately turned a blind eye to results thereof.

8

22.    During the Class Period in the Securities Class Action, the Individual Defendants, in breach of their fiduciary duties owed to Microchip, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that the Acquisition would be "immediately accretive" or that the Company would generate enough free cash flow to pay down the $8.6 billion in debt incurred in the Acquisition quickly; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the Acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks, or recklessly disregarded such information; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

23.    The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

24.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain internal controls.

25.    Furthermore, during the Class Period in the Securities Class Action when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $4 million.

26.    The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company and its Chairman and Chief Executive Officer ("CEO") and its President and Chief Operating Officer ("COO") to the Securities Class

Action pending in this District, the Company, its Chairman and CEO, its President and COO, its Chief Financial Officer ("CFO") and Vice President, and its Vice President, Worldwide Sales & Applications to the Slander Action alleging claims for slander, libel, trade libel, and unfair competition under California law brought by former executives of Microsemi, and the need to undertake internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company and who received proceeds of insider sales, and whose misconduct is costing the Company millions of dollars.  The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO/Chairman's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in

controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

31.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.    Venue is proper in this District because Microchip is headquartered in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

33.    Plaintiff is a current shareholder of Microchip. Plaintiff has continuously held Microchip common stock at all relevant times. Plaintiff is a citizen of the State of New Jersey.

### Nominal Defendant Microchip

34.    Microchip is a Delaware corporation with its principal executive offices at 2355 W. Chandler Blvd., Chandler, Arizona 85224-6199. Microchip's shares trade on the NASDAQ under the ticker symbol "MCHP."

### Defendant Sanghi

35.    Defendant Stephen Sanghi, Jr. ("Sanghi") founded Microchip, has served as a director since 1990, as the Company's CEO since 1991, and as Chairman of the Board since 1993. He previously served as the Company's President from 1990 to 2016. According to the Company's Schedule 14A filed with the SEC on July 12, 2018 (the "2018 Proxy Statement"), as of May 20, 2018, Defendant Sanghi beneficially owned 4,601,880 shares of the Company's common stock, representing 1.96% of all outstanding stock as of that date.[2] Given that the price per share of the Company's

---

[2] Includes 1,648,944 shares held of record by The Sanghi Trust (the "Sanghi Trust") and 2,952,936 shares held of record by The Sanghi Family Limited Partnership (the "Family Limited Partnership"). Defendant Sanghi and Maria T. Sanghi are the sole trustees of the Sanghi Trust. The Sanghi Trust is the sole member of the Sanghi LLC which is the

common stock at the open of trading on Monday, May 21, 2018 was $93.92, Sanghi owned over $432.2 million worth of Microchip stock.

36.     For the fiscal year ended March 31, 2018, Defendant Sanghi received $7,893,460 in compensation from the Company. This included $740,042 in salary, $48,012 in bonus, $4,464,406 in stock awards, $2,632,141 in non-equity incentive plan compensation, and $8,859 in all other compensation.

37.     During the Class Period in the Securities Class Action and while the price of Microchip stock was artificially inflated, Defendant Sanghi made no purchases of Company stock, and sold 20,124 shares of Company stock on March 6, 2018 at $94.80 per share, from which he received proceeds in the amount of approximately $1,907,755. During the 5 months preceding the Class Period, Sanghi sold no shares of his Company stock, and he has not sold any since the end of the Class Period. His insider sale made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme. Defendant Sanghi is a named defendant in the Securities Class Action charged with violations of sections 10(b) and 20(a) of the Exchange Act.

38.     The Company's 2018 Proxy Statement stated the following about Defendant Sanghi:

> *Steve Sanghi*[3] has served as Chief Executive Officer since October 1991, and as Chairman of the Board since October 1993. He served as President from August 1990 to February 2016 and has served as a director since August 1990. In November 2016, Mr. Sanghi joined the Board of Directors of Myomo, Inc., a publicly traded commercial stage medical robotics company that offers expanded mobility for those suffering from neurological disorders and upper-limb paralysis. In February 2018, Mr. Sanghi joined the Board of Directors of Mellanox Technologies Ltd., a publicly traded supplier of end-to-end Ethernet and InfiniBand intelligent

---

sole general partner of the Family Limited Partnership.

[3] Emphasis is in the original unless otherwise noted throughout.

interconnect solutions and services for servers, storage, and hyper-converged infrastructure.

39.     Defendant Sanghi is a citizen of the State of Arizona.

**Defendant Moorthy**

40.     Defendant Ganesh Moorthy ("Moorthy") has served as the Company's COO since 2009, and as the Company's President since 2016. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Moorthy beneficially owned 234,193 shares of the Company's common stock.[4] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Moorthy owned approximately $22 million worth of Microchip stock. Defendant Moorthy is a named defendant in the Securities Class Action charged with violations of sections 10(b) and 20(a) of the Exchange Act.

41.     For the fiscal year ended March 31, 2018, Defendant Moorthy received $3,292,308 in compensation from the Company. This included $412,713 in salary, $28,523 in bonus, $2,252,329 in stock awards, $589,160 in non-equity incentive plan compensation, and $9,583 in all other compensation.

42.     The Company's website states the following about Defendant Moorthy:[5]

Mr. Moorthy was named the President of Microchip in February 2016.  He served as Chief Operating Officer since June 2009 and as Executive Vice President from October 2006 to May 2009.  From November 2001 to October 2006 Mr. Moorthy served as Vice President of several Microchip divisions. Mr. Moorthy holds an M.B.A. in marketing from the National University, Sacramento, Calif.; a B.S. degree in electrical engineering from the University of Washington, Seattle, Wash.; and a B.S. degree in physics from the University of Bombay, Bombay, India.

43.     Defendant Moorthy is a citizen of the State of Arizona.

---

[4] This figure includes 234,193 shares held of record by Defendant Moorthy and Hema Moorthy as trustees.

[5] https://www.microchip.com/about-us/leadership. Last visited December 11, 2018.

13

**Defendant Bjornholt**

44.     Defendant James Eric Bjornholt ("Bjornholt") has served as the Company's CFO and Vice President since 2009, and as Corporate Secretary since 2003. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Bjornholt beneficially owned 21,869 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Bjornholt owned approximately $2.1 million worth of Microchip stock.

45.     For the fiscal year ended March 31, 2018, Defendant Bjornholt received $1,068,118 in compensation from the Company. This included $256,094 in salary, $17,341 in bonus, $640,938 in stock awards, $145,739 in non-equity incentive plan compensation, and $8,006 in all other compensation.

46.     During the Class Period in the Securities Class Action and while the price of Microchip stock was artificially inflated, Defendant Bjornholt made no purchases of Company stock, and sold 2,308 shares of Company stock on May 22, 2018 in three separate sales at $93.55 per share each, from which he received proceeds in the amount of approximately $215,913. These sales were made pursuant to a 10b5-1 trading plan that he entered into on March 6, 2018, within days of the announcement of the Acquisition. Thus, the timing of Bjornholt's decision to sell his stock coincides with the other 5 Individual Defendants who engaged in insider trading. During the 5 months preceding the Class Period, Bjornholt sold no shares of his Company stock, and he has not sold any since the end of the Class Period. His insider sales made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme. Defendant Bjornholt is a named defendant in the Securities

[6] This figure includes 21,869 shares held of record by Defendant Bjornholt and Lynn Bjornholt as trustees.

14

Class Action charged with violations of sections 10(b) and 20(a) of the Exchange Act.

47.    The Company's website states the following about Defendant Bjornholt:[7]

> Mr. Bjornholt has served as Vice President and Chief Financial Officer since January 2009, and has served as Corporate Secretary since 2003. He served as Director of Financial Reporting and Tax from 2003 to 2008. He has held various other financial management positions within Microchip since joining the company in 1995. Prior to joining Microchip, Mr. Bjornholt was employed by KPMG LLP. Mr. Bjornholt holds a B.S. degree in accounting from the University of Arizona and a Masters degree from Arizona State University.

48.    Defendant Bjornholt is a citizen of the State of Arizona.

**Defendant Chapman**

49.    Defendant Matthew W. Chapman ("Chapman") has served as a Company director since 1997, and serves as the Chair of the Audit Committee. The Board of Directors has determined that Defendant Chapman meets the requirements for being an "audit committee financial expert" as defined by applicable SEC rules. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Chapman beneficially owned 23,469 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Chapman owned over $2.2 million worth of Microchip stock.

50.    For the fiscal year ended March 31, 2018, Defendant Chapman received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

51.    During the Class Period in the Securities Class Action, Defendant Chapman made no purchases of Company stock, and sold 6,000 shares of Company stock on March 5, 2018 at $94.08 per share, from which he benefited in the amount of approximately $564,492. The sale of these shares represented over 20% of his Company holdings. During the 5 months preceding the Class Period, Chapman sold no shares of

---

[7] https://www.microchip.com/about-us/leadership. Last visited December 11, 2018.

his Company stock, and he has not sold any since the end of the Class Period. His insider sale made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Chapman:

> *Matthew W. Chapman* has served as a director of Microchip since May 1997. After serving for over 11 years, Mr. Chapman retired in February 2018 from his position as Chief Executive Officer of Northwest Evaluation Association, a not-for-profit education services organization providing computer adaptive testing for millions of students throughout the United States and in 140 other countries. In his career, Mr. Chapman has served as CEO and Chairman of Concentrex Incorporated, a publicly held company specializing in supplying software solutions and service to U.S. financial institutions. Mr. Chapman served as a member of the Board of Directors of the Oregon Business Association and Knowledge Alliance. He is currently serving on the Board of Regents of the University of Portland and the board of two not-for-profit organizations.

53.     Upon information and belief, Defendant Chapman is a citizen of the State of Oregon.

**Defendant Day**

54.     Defendant L.B. Day ("Day") has served as a Company director since 1994. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Day beneficially owned 10,967 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Day owned over $1 million worth of Microchip stock.

55.     For the fiscal year ended March 31, 2018, Defendant Day received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

56.     During the Class Period in the Securities Class Action, Defendant Day made no purchases of Company stock, and on March 7, 2018, sold 3,000 shares of

16

Company stock at $95.04 per share and another 3,000 shares of Company stock at $95.20 per share, from which he received proceeds in the amount of approximately $570,720. The sale of these shares represented over 35% of his Company holdings. During the 5 months preceding the Class Period, Day sold no shares of his Company stock, and he has not sold any since the end of the Class Period. His insider sales made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

57.     The Company's 2018 Proxy Statement stated the following about Defendant Day:

> *L.B. Day* has served as a director of Microchip since December 1994. Mr. Day serves as President of L.B. Day & Company, Inc., which provides strategic planning, strategic marketing and organization design services to the elite of the technology world. He has written on strategic planning and is involved with competitive factor assessment in the semiconductor and other technology market segments, geared to helping client organizations incorporate competitive factor assessment findings into their strategic plans. He has served as a board member or as an advisor to many public and private boards board of two not-for-profit organizations.

58.     Upon information and belief, Defendant Day is a citizen of the State of Oregon.

**<u>Defendant Johnson</u>**

59.     Defendant Esther L. Johnson ("Johnson") has served as a Company director since 2013, and is a member of the Audit Committee. According to the 2018 Proxy Statement, as of May 20, 2018, Defendant Johnson beneficially owned 6,081 shares of the Company's common stock. Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Johnson owned approximately $571,128 worth of Microchip stock.

60.     For the fiscal year ended March 31, 2018, Defendant Johnson received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or

paid in cash, and $81,068 in stock awards.

61.     During the Class Period in the Securities Class Action, Defendant Johnson made no purchases of Company stock, and sold 2,275 shares of Company stock on March 14, 2018 at $97.90 per share, from which she received proceeds in the amount of approximately $222,732. The sale of these shares represented over 27% of her Company holdings. During the 5 months preceding the Class Period, Day sold no shares of his Company stock, and she has not sold any since the end of the Class Period. Her insider sale made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

62.     The Company's 2018 Proxy Statement stated the following about Defendant Johnson:

> *Esther L. Johnson* has served as a director of Microchip since October 2013. From April 2007 until her April 2012 retirement, Ms. Johnson served as the Vice President and General Manager of Carrier Electronics, a provider of high technology heating, air-conditioning and refrigeration solutions, and a part of United Technology Corporation, a publicly held company that provides high technology products and services to the aerospace and building systems industries. Prior to her position as Vice President and General Manager, since 1983, Ms. Johnson held a variety of other management positions with Carrier Electronics, including Director of Operations and Global Supply Chain Manager. Ms. Johnson was instrumental in Carrier being recognized by Industry Week as one of the "Top 10 Factories in North America." She has served as a board member on multiple private company boards.

63.     Upon information and belief, Defendant Johnson is a citizen of the State of Arizona.

**Defendant Meyercord**

64.     Defendant Wade F. Meyercord ("Meyercord") has served as a Company director since 1999, and serves as a member of the Audit Committee. The Board of Directors has determined that Defendant Meyercord meets the requirements for being an "audit committee financial expert" as defined by applicable SEC rules. According to

the 2018 Proxy Statement, as of May 20, 2018, Defendant Meyercord beneficially owned 30,432 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the open of trading on Monday, May 21, 2018 was $93.92, Meyercord owned approximately $2.9 million worth of Microchip stock.

65.     For the fiscal year ended March 31, 2018, Defendant Meyercord received $164,568 in compensation from the Company, comprised of $83,500 in fees earned or paid in cash, and $81,068 in stock awards.

66.     During Class Period in the Securities Class Action, Defendant Meyercord made no purchases of Company stock, and sold 5,000 shares of Company stock on March 6, 2018 at $94.92 per share, from which he received proceeds in the amount of approximately $474,590. During the 5 months preceding the Class Period, sold no Meyercord shares of his Company stock, and he has not sold any since the end of the Class Period. His insider sale made with knowledge or reckless disregard of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

67.     The Company's 2018 Proxy Statement stated the following about Defendant Meyercord:

*Wade F. Meyercord* has served as a director of Microchip since June 1999. Since October 2002, he has served as President of Meyercord & Associates, Inc., a privately held management consulting firm specializing in executive compensation matters and stock plan consulting for technology companies, a position he previously held part time beginning in 1987. Mr. Meyercord served as a member of the Board of Directors of Endwave Corporation, a publicly held company, from March 2004 until it was acquired in 2011. Mr. Meyercord served as a member of the Board of Directors of California Micro Devices Corporation, a publicly held company, from January 1993 to October 2009 and Magma Design Automation, Inc., a publicly held company, from January 2004 to June 2005.

---

[8] As reported by the 2018 Proxy Statement, this figure includes 30,432 shares held of record by Defendant Meyercord and Phyllis Meyercord as trustees, and 3,000 shares issuable upon exercise of options that are exercisable within 60 days of May 20, 2018.

68.     Upon information and belief, Defendant Meyercord is a citizen of the State of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

69.     By reason of their positions as officers and/or directors of Microchip and because of their ability to control the business and corporate affairs of Microchip, the Individual Defendants owed Microchip and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Microchip in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Microchip and its shareholders so as to benefit all shareholders equally.

70.     Each director and officer of the Company owes to Microchip and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

71.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Microchip, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

72.     To discharge their duties, the officers, directors, and controllers of Microchip were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

73.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controllers of Microchip, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were

aware or should have been aware posed a risk of serious injury to the Company. The misconduct of the Individual Defendants who were officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Microchip's Board.

74.     As senior executive officers, directors, and controllers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this first amended shareholder derivative complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

75.     To discharge their duties, the officers and directors of Microchip were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Microchip were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Arizona, and the United States, and pursuant to Microchip's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Microchip conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Microchip and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Microchip's operations would comply with all applicable laws and Microchip's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

76.     Each of the Individual Defendants further owed to Microchip and the shareholders the duty of loyalty requiring that each favor Microchip's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

77.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Microchip and were at all times acting within the course and scope of such agency.

78.     Because of their advisory, executive, managerial, directorial, and controlling positions with Microchip, each of the Individual Defendants had access to adverse, non-public information about the Company.

79.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Microchip.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

80.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

81.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

82.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the

23

Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Microchip was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

83.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

84.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Microchip, and was at all times acting within the course and scope of such agency.

## MICROCHIP'S CODE OF CONDUCT

85.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[a]ll directors, officers, employees, and contractors of Microchip Technology Incorporated or any of its subsidiaries . . . (hereafter, "Covered Persons") are expected to read and understand this Code of Business Conduct and Ethics, uphold these standards in day-to-day activities, and comply with all applicable policies and procedures."

86.     The Code of Conduct provides that the purpose thereof is to "deter wrongdoing and promote":

• Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

24

• ***Full, fair, accurate, timely, and understandable disclosure of reports and documents that Microchip Technology Incorporated files with, or submits to, the SEC and in other public communications made by the Company***;

• Compliance with applicable governmental laws, rules, and regulations;

• Prompt internal reporting to an appropriate person or persons of violations of this Code of Business Conduct and Ethics; and

• Accountability for adherence to this Code of Business Conduct and Ethics.

(Emphasis added.)

87.    The Code of Conduct provides, regarding reporting violations thereof, that:

Part of your job and ethical responsibility is to help enforce this Code of Business Conduct and Ethics. ***You should be alert to possible violations of this policy and report possible violations of any Company policy*** to the Vice President of the Human Resources Department, the General Counsel, or the Chief Financial Officer, as appropriate.

* * *

As part of your commitment to ethical and legal conduct, ***the Company expects you to report suspected violations of this policy or of any applicable law, by any Covered Person***.

* * *

With regard to suspected violations of accounting or auditing policies or requirements, violations of federal or state securities laws or bribery of foreign officials, please see the Reporting Legal Non-Compliance Policy (HR-675). ***You are required to come forward with any such information about suspected violations of this Code of Business Conduct and Ethics without regard to the identity or position of the suspected offender***. The Company will treat the information in a confidential manner (except as necessary to conduct the investigation and take any remedial action, and in accordance with applicable law) and will seek to ensure that no acts of retribution or retaliation will be taken against anyone for making a report.

Because failure to report criminal activity can itself be understood to condone the crime, we emphasize the importance of reporting. Failure to report knowledge of wrong-doing may result in disciplinary action, civil

or criminal liability, or a combination of all against those who fail to report.

(Emphasis added.)

88.    In violation of the Code of Conduct, the Individual Defendants failed to perform adequate due diligence in connection with the Acquisition and to the extent they did perform due diligence knew or recklessly disregarded the adverse information about Microsemi's inventory issues, engaged in a scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Six of the Individual Defendants violated the code by selling shares of Company stock during the Class Period in the Securities Class Action while in possession of material, non-public information about the Company. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and properly report violations of the Code of Conduct.

**Additional Duties of the Audit Committee Defendants**

89.    In addition to the duties set forth above, under its charter as amended in 2015, Audit Committee members Defendants Chapman, Meyercord and Johnson (the "Audit Committee Defendants"), owed additional duties to the Company to oversee the accounting and financial reporting processes of the Company and provide the Board of Directors with the results of such monitoring. Specifically, the Charter provides:

the purpose of the Audit Committee of the Board of Directors (the "Committee) of Microchip Technology Incorporated (the "Company") shall be:

*      *      *

To oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company;

*      *      *

POWERS:

The Committee shall have the power to:

- conduct or authorize investigations into any matters within the Committee's scope of responsibilities;

- engage independent counsel and other advisors, as it determines necessary to carry out its duties, and to determine the appropriate funding level for such activities and for ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties; and

- authorize funding for payment of compensation to any registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company.

RESPONSIBILITIES:

The responsibilities of the Committee shall include:

\*          \*          \*

- Providing oversight and monitoring of Company management and their activities with respect to the Company's financial reporting process, accounting policies, tax matters, disclosure controls and procedures and internal controls;

\*          \*          \*

Reviewing and discussing with management, before release, the unaudited interim financial results in the Company's quarterly earnings' releases;

\*          \*          \*

Reviewing management's monitoring of compliance with the Company's code of conduct.

**MICROCHIP'S INSIDER TRADING POLICY**

90.    The Company has also adopted an insider trading policy. The policy provides, regarding the intent thereof, in relevant part, that:

**ANYONE WHO ENGAGES IN A TRANSACTION IN MICROCHIP SECURITIES OR THE SECURITIES OF OTHER PUBLIC COMPANIES ENGAGED IN BUSINESS OR IN A BUSINESS TRANSACTION WITH MICROCHIP OR ITS SUBSIDIARIES WHILE AWARE OF MATERIAL NON-PUBLIC INFORMATION MAY BE SUBJECT TO CIVIL AND CRIMINAL LIABILITIES AND PENALTIES, WHICH MAY INCLUDE DISGORGEMENT OF ANY PROFITS MADE OR LOSSES AVOIDED, FINES OR IMPRISONMENT, AS WELL AS DISCIPLINARY ACTION BY MICROCHIP.**

91. With respect to trading with knowledge of material non-public information, the insider trading policy provides, in relevant part:

> *If you are aware of any material non-public information relating to the Company* which may include information related to quarterly earnings or changes in analyst estimates or Company guidance, changes in control or senior management, significant mergers, acquisitions or divestitures, changes in dividend policy, changes in auditors or bankruptcy, regardless of how you obtained the information, *you, your immediate family, and anyone else living with you in your residence or living elsewhere but under your economic control, must refrain from trading (buying or selling) the Company's securities either directly or indirectly*. It does not matter where or how the stock or other securities were originally acquired. The foregoing trading prohibitions cover all forms of transactions in the Company's securities, including limit orders, stop loss orders, puts, calls, and other derivative transactions. Additionally, dividend reinvestment programs (DRIP) and automatic sale programs (except with respect to certain trading plans under Rule 10b5-1(c) as described in Section 8 hereof) should be avoided as they can result in trades during blackout periods.

(Emphasis added.)

92. In violation of the insider trading policy, six of the Individual Defendants sold Company shares based on material, non-public information, obtaining an aggregate benefit of approximately $4 million. The majority of these transactions were conducted within a week of the announcement of the Microsemi acquisition.

# SUBSTANTIVE ALLEGATIONS

## Background Allegations

### Background on Microchip

93.     Microchip describes itself as a leading provider of microcontroller, mixed signal, analog and Flash-IP solutions. It was founded in 1987 and became a publicly traded company in 1993. The Company operates on an April 1 to March 31 fiscal year. The Company's first quarter ends June 30; second quarter ends September 30; third quarter ends December 31; and fourth quarter (and fiscal year) ends March 31.

94.     The Company fueled growth by acquisition, acquiring 17 companies from 2008 through 2016, when it acquired Atmel. For example, for fiscal year 2007 (ending March 30, 2008), Company net sales were $1.0357 billion. By fiscal year 2017 (ending March 31, 2018), Microchip's net sales had reached $3.9808 billion.

95.     Generally, for one year after an acquisition, Microchip was able to report substantial year-over-year revenue and earnings growth and record revenue and income. After that first year the growth would dissipate, and the Individual Defendants would be able to report only much slower organic growth.

96.     An example is the Atmel acquisition. On May 9, 2017, the Company reported financial results for the fourth quarter after the Atmel acquisition closed (4Q FY2017 ending March 31, 2017). Microchip reported quarterly GAAP net sales of $902.7 million, an increase of 61% over the prior year's fourth quarter. The Company also reported non-GAAP net sales of $902.7 million, a year-over-year increase of 58.8%.

97.     Subsequently, on August 3, 2017, the Company reported financial results for the fifth quarter after the Atmel acquisition closed (1Q FY2018 ending June 30, 2017). Microchip reported only a 21.6% year-over-year growth in GAAP net sales and a 15.2% year-over-year growth in non-GAAP net sales. Thus, by June 2017, the Company was required to enter a new acquisition to continue to fuel growth. However, due to significant consolidation in the semiconductor industry over the prior three years, there were not many attractive candidates left.

98.     According to the Slander Action, with the lack of attractive acquisition candidates Microchip's "growth-through-acquisition strategy ha[d] accelerated along with the recent consolidation trend in the semiconductor industry." Slander Action Complaint ¶ 76. In order to keep up the growth by acquisition strategy, the Individual Defendants were forced to utilize significant debt in order to finance ambitious acquisitions of related semiconductor and wireless companies, with the goal of outpacing the Company's competitors.

### Background on Microsemi

99.     According to Microsemi's Form 10-K for fiscal year 2017 that was filed with the SEC on November 14, 2017 (the "Microsemi 2017 Form 10-K"), Microsemi was "a leading designer, manufacturer and marketer of high-performance analog and mixed-signal semiconductor solutions differentiated by power, security, reliability and performance." Microsemi 2017 Form 10-K at 5.

100.     Microchip acquired Microsemi in a cash acquisition announced on March 1, 2018 and completed on or about May 29, 2018. Prior to its acquisition by Microchip, Microsemi common stock traded on the NASDAQ under the symbol "MSCC" and operated on an October through September fiscal year. Microchip paid approximately of $8.34 billion to acquire Microsemi, for a total value of $10.15 billion including net debt.

101.     In fiscal year 2017, Microsemi performed very well financially, reporting net sales exceeding $1.81 billion and gross profits of $1.16 billion on November 9, 2017. That positive performance continued into the first half of fiscal year 2018 with Microsemi reporting net sales for the first quarter of $468 million, an increase of 7.6% year-over-year and net sales of $492.2 million for the second quarter of fiscal year 2018.

### The Slander Action

102.     From July 2017, through the closing of the Acquisition, James J. Peterson ("Peterson") was Chairman of the Board and CEO of Microsemi; Frederick Goerner ("Goerner") was Microsemi's Executive Vice President, Worldwide Sales; Paul Pickle

("Pickle") was President and COO of Microsemi; and Philip Sansone ("Sansone") was Microsemi's Vice President, Global Distribution Sales.

103.    On or about October 9, 2018, Peterson, Goerner, Pickle, and Sansone (collectively, the "Peterson Plaintiffs") filed a complaint for (1) Slander *Per Se*; (2) Libel *Per Se*; (3) Trade Libel; and (4) Unfair Competition in Violation of Cal. Bus. & Prof. Code §17200 against Individual Defendants Sanghi, Moorthy, Bjornholt and Microchip, as well as some others (collectively, the "Microchip Defendants").

104.    The Slander Action alleges that Microsemi provided all of its inventory, distribution, and sales data to Microchip as part of the due diligence process in connection with the Acquisition. This documentation included, among many other things, comprehensive historical data going back at least three years describing each Microsemi product line's channel inventory levels. The Slander Action alleges that Sanghi and others falsely claimed that they only learned of those facts after the Acquisition closed.

105.    On December 7, 2018, the Microchip Defendants moved to dismiss the complaint but did not challenge the truth of the allegations. Rather, the motion to dismiss sought dismissal on the grounds that (a) the complaint lacked facts showing the alleged defamatory statements referred to the Peterson Plaintiffs, (b) the alleged defamatory statements were protected by qualified privilege, (c) a claim for trade libel was not alleged because the alleged defamatory statements did not concern products or services, (d) elements of a claim for unfair competition were not alleged, and (e) the Slander Action complaint was a strategic lawsuit against public participation ("SLAPP," or an "Anti-SLAPP Motion").

106.    On February 14, 2019, the Slander Action Court issued an order that (a) struck the Microchip Defendants Anti-SLAPP motion for failure to meet and confer with the Peterson Plaintiffs in accordance with local rules, (b) denied the motion to dismiss the slander and libel claims, and (c) granted the motion to dismiss as to the trade libel

claims. The Peterson Plaintiffs voluntarily dismissed the unfair competition claims prior to the Court's decision on the motion to dismiss.

### The Individual Defendants Were Aware of the Stark Difference Between GAAP (Sell-In) and Non-GAAP (Sell-Through) Results

107.    Microchip reported on both a GAAP and non-GAAP basis its net sales, gross margins, operating income, net income from continuing operations, and earnings per share ("EPS"). While GAAP required that revenue be recognized when products were sold to distributors, the Individual Defendants favored running the Company based on non-GAAP sell-through revenue recognition, or recognizing revenue when products were sold to end users, not distributors, The Individual Defendants strongly believed that non-GAAP information based on sell-through to ultimate end user customers was a better barometer of product demand.

108.    For example, Microchip issued quarterly press releases announcing its financial results on (a) February 7, 2017 (3Q FY2017), (b) May 7, 2017 (4Q FY2017), (c) August 3, 2017 (1Q FY2018), (d) November 6, 2017 (2Q FY2018), and (e) February 6, 2018 (3Q FY2018). Each of these press releases (except for the November 6, 2017 press release) listed Individual Defendant Bjornholt as the Investor Relations Contact for the press release.   In each of the press releases, the Individual Defendants reported net sales, gross margins, operating income, net income from continuing operations, and EPS on both a GAAP and non-GAAP basis.

109.    Microchip also held earnings conference calls with analysts on February 7, 2017, May 9, 2017, August 3, 2017, November 6, 2017, and February 6, 2018 to discuss Microchip's quarterly financial results. On each of those earning conference calls, Individual Defendants Sanghi and Bjornholt discussed the Company's net sales, gross margins, operating income, net income from continuing operations, and EPS on a GAAP and non-GAAP basis.  Further, Sanghi also asked analysts to report earnings on a non-GAAP basis: "We believe that non-GAAP results provide more meaningful

comparison to prior quarters, and we request that analysts continue to report the non-GAAP estimates to first call." 2/7/2017 Tr. at 6; 5/9/2017 Tr. at 6; 8/3/2017 Tr. at 6; 11/6/2017 Tr. at 5; 26/2018 Tr. at 5.

110.   A review of Microchip's executive compensation practices demonstrates the importance placed on non-GAAP metrics. For example, the Company's 2017 Proxy Statement ("2017 Proxy") stated that executive compensation was based on certain performance metrics under the Company's Executive Management Incentive Compensation Plan ("EMICP"). 2017 Proxy at 19-21. While these metrics "may be based on either GAAP or non-GAAP financial results at the discretion of the Compensation Committee," *id.* at 20, the 2017 Proxy stated that the Committee "typically uses non-GAAP information when setting the [EMICP] targets." Therefore, at the time immediately prior to approaching Microsemi about a potential transaction to acquire Microsemi, the Individual Defendants were aware of the stark difference between GAAP and non-GAAP result calculations, and the stark difference between sell-in and sell-through net sales revenue.

### The Individual Defendants Were Aware of Microchip's and Its Distributors' Inventory Levels and the Importance of Inventory to a Semiconductor Manufacturer

111.   In the year leading up to when Microchip approached Microsemi concerning a potential transaction, the Individual Defendants repeatedly informed the public about Microchip's current and expected days of inventory, current inventory balance, and current inventory at distributors. They also discussed inventory target levels, and/or compared current and expected inventory to those levels. For each quarter ending December 31, 2016 through December 31, 2017, Microchip and Individual Defendant Bjornholt announced the Company's inventory as well as inventory at its distributors. Those included: 2/7/2017 press release and earnings conference call; 5/9/2017 press release and earnings conference call; 8/3/2017 press release and earnings conference call; 11/6/2017 press releases and earnings conference call. Individual

Defendants Sanghi and Bjornholt provided additional updates on inventory levels as of December 31, 2017 to investors on February 6, 2018 via a press release and earnings conference call.

112.    Thus, at the time immediately prior to approaching Microsemi about a potential transaction to acquire Microsemi, the Individual Defendants were well aware of Microchip's and its distributors' inventory levels, the importance of inventory and those inventory levels to a semiconductor producer, and the importance of inventory and inventory at its distributor (in the supply chain).

### **Microchip's Prior Acquisitions Demonstrate the Individual Defendants' Knowledge of the Need to Conduct Thorough Due Diligence of Microsemi**

113.    Based on Microchip's numerous prior acquisitions, the Individual Defendants had extensive knowledge and experience in variations in sales and inventory levels of acquired companies, and they had the ability to analyze those metrics during due diligence.

114.    For example, on January 19, 2016, Microchip announced in a press release that it would require Atmel, a designer and manufacturer of microcontrollers based in San Jose, for $8.15 per share in a combination of $7.00 per share in cash and $1.15 per share in stock, for a total equity value of approximately $3.56 billion. In the press release Individual Defendants Sanghi and Moorthy praised the Atmel acquisition and elaborated on that sentiment during Microchip's investor call that same day.

115.    That praise was short lived. On April 4, 2016, Microchip announced that it had completed the acquisition of Atmel. In the press release announcing the completion of the transaction, Sanghi stated:

> The performance of Atmel since we engaged in discussions in August of 2015 has been disappointing. We believe in the large drop in Atmel revenue in the March 2016 quarter is *likely the result of an inventory correction in the distribution channel as distributors reduced inventory levels,* overall weak business conditions, and concerns on the part of distributors surrounding the impact of the sale of Atmel to Microchip. We took some of

this weakness into consideration in dropping the final acquisition price from our original offer.

(Emphasis added.)

116.    The Individual Defendants elaborated on the inventory correction issues during the investor call that day. For example, Sanghi noted that "in calendar year 2015 [the immediately preceding calendar year] Atmel's distributors, *where revenue is recognized on a sell-in basis,* increased their inventory levels significantly." 4/4/ 2016 Tr. at 2. Sanghi continued:

> Subsequently, Atmel saw a severe inventory contraction in the distribution channel across its entire business. Atmel recognized revenue in Americas and Europe based on sell-through from distribution but recognize[d] revenue in Asia based on sell-in to distribution. *This is a typical peril of sell-in revenue recognition that we have discussed with investors for years.* Microchip will consolidate Atmel's results into Microchip on a non-GAAP basis based on sell-through revenue recognition from the very beginning to provide a more reasonable estimate of the size of the business. [*Id.*]

(Emphasis added.)

117.    Individual Defendant Bjornholt noted that "we need to get the inventory portion of the distributors. We know distributor inventory came down significantly. Whether there is any more to come, I think it's a little too early for us to comment on that. But I think a large piece for the correction has happened at this point." *Id.* at 5.

118.    Clearly, the Individual Defendants understood (at the very least, by no later than the Atmel acquisition) that distinctions between sell-in and sell-through models were crucial metrics, and the difference between the two, and inventory in the channel, needed to be examined in any potential acquisition target. This should have alerted the Individual Defendants to be more thorough in the Microsemi due diligence and examine inventory levels and revenue recognition of Microsemi.

**Microsemi Only Reported Company Inventory Levels on a Quarterly Basis; Not Distributor Inventory and Only Reported GAAP Sales, Not Non-GAAP Sales**

119.   Microsemi only disclosed company inventory levels in its quarterly conference calls. It did not disclose distributor inventory. *See, e.g.*, 1/26/2017 conference call, 4/27/2017 conference call, 7/27/2017 conference call, 11/9/2017 conference call, 1/25/2018 conference call.

120.   The Microsemi 2017 Form 10-K also discussed Microsemi's distributors and inventory, and the fact that Microsemi recognized revenue on sales to distributors (sell-in), as opposed to Microchip's preferred method to recognize revenue on sales to end users (sell-through):

> We generate a portion of our sales through third-party distribution and seller agreements.
>
> *       *       *
>
> We primarily recognize revenue from customers, including distributors, when title and risk of loss have passed to the customer provided that: 1) evidence of an arrangement exists; 2) delivery has occurred; 3) the fee is fixed or determinable; and 4) collectability is reasonably assured. For substantially all product sales, revenue is recognized, net of estimated returns and discounts, at the time the product is shipped

121.   In stark contrast to Microchip, Microsemi did not disclose distributor inventory or non-GAAP sell-through to ultimate customers – both of which were important metrics to the Individual Defendants in the operation of the Company. This was a red flag with respect to Microsemi's inventory management and, but for a reckless disregard for the truth, would have been a focus of Microchip's due diligence.

**Microchip Purportedly Conducted Extensive Due Diligence on Microsemi's Business**

122.   Given that the Acquisition was over $10 billion, and consistent with their prior experience with acquisitions of companies with inconsistent means of reporting inventory levels, the Individual Defendants purportedly caused Microchip to conduct

extensive due diligence of Microsemi. Indeed, Microchip's due diligence team for the Acquisition had at least 25 members. Slander Action Complaint ¶¶ 5, 99.

123.    "[I]n December 2017, well before the Merger Agreement was signed, Goerner gave a PowerPoint presentation to Sanghi and other Microchip executives that detailed Microsemi's relationships with its largest customers and the incentive programs Microsemi had put in place to drive sales, showing the proportion of Microsemi's revenue that was attributable to sales distributors." Slander Action Complaint ¶ 104. The "December 2017,… PowerPoint presentation to Microchip executives…provided explicit data regarding Microsemi's revenue sources, including information sufficient to show the proportion of revenue attributable to distributors versus customers." *Id.* ¶ 7.

124.    From December 11, 2017 through mid-January 2018, Microsemi and its financial advisors provided due diligence to Microchip and its financial advisors. Microsemi Form 14A filed with the SEC on April 19, 2018 at 31, 33 (the "Microsemi Merger Proxy").  On January 31, 2017, Microchip made its best and final non-binding offer at $68.78 per share, subject to a 30-day exclusivity agreement that was entered into later that same day. *Id.* at 35.

125.    Next, "[o]n February 2, 2018, Microsemi received a written due diligence request list from Microchip, and Microsemi provided Microchip with access to Microsemi's virtual data room [(the 'Data Room')]."

126.    "Microsemi granted Microchip unrestricted access to 15.3 gigabytes of data (more than 4,650 files) consisting of years of confidential financial and operational information that had been collected in the Data Room." Slander Action Complaint ¶ 100. In fact, "Microchip, including Sanghi, and its attorneys had unfettered access to the Data Room and received notifications whenever documents were added. Microsemi and its attorneys could see whether information in the Data Room had been accessed." *Id.* ¶ 122. Those documents and other information in the Data Room had "all the information necessary to understand the manufacturing lead times for Microsemi's products, consumer demand to both Microsemi and its distributors, historic inventory levels in the

distribution channel, and the proper bases for Microsemi's revenue recognition practices." *Id.* ¶122.

127.    According to the Securities Class Action Complaint, Microsemi's Vice President of Sales through the end of May 2018 (the "Former Sales VP")  was aware of the information in the Data Room because it was the Former Sales VP's responsibility to make sure that documents and information created or received in the normal course of Microsemi's business was available to be put in the Data Room, including inventory reports and point-of-sale ("POS") reports. Distributor level inventory data was put in the Data Room in spreadsheets and perhaps PowerPoint documents. Securities Class Action Compliant ¶ 161. Based on a conversation with Pickle, the Former Sales VP had a good faith belief that all the data that Microchip and the Individual Defendants later claimed was misrepresented by Microsemi or was not provided by Microsemi was in the Data Room. *Id.* ¶ 162; Slander Action Complaint ¶102.

128.    According to the Securities Class Action Complaint, the Former Sales VP also stated that information concerning distributor inventory levels were sent to Microsemi by the distributor themselves and were required by Microsemi to submit POS reports, as well as inventory levels, on a monthly basis. *Id.* ¶163. Microsemi had constant access to data on inventory levels at distributors and in the distribution channel, and the former Vice President of Sales for the Americas ("Sales VP Americas") reported to the Former Sales VP confirming that the Data Room contained files and data on Microsemi's inventory positions with its distributors. *Id.* ¶¶ 164-65, 167. The Sales VP Americas also stated that it was easy to calculate the amount of inventory Microsemi's distributors had by taking the amount of inventory Microsemi shipped to the distributors and then subtracting the amounts that the distributors shipped to end-user customers. *Id.* ¶ 168.

129.    During the remainder of February 2018, Microsemi, Microchip and their respective advisors participated in diligence calls and Microsemi and its advisors

responded to additional due diligence requests from Microchip and its advisors. (Microsemi Merger Proxy).

130.    From February 25, 2018 to March 1, 2018, the parties continued to negotiate the terms of the Acquisition, and Microchip continued to conduct due diligence. *Id.*

131.    The Microsemi Merger Proxy further asserted that Microchip had been provided with financial projections, stating, in relevant part:

> Although Microsemi has publicly issued limited short-term guidance concerning certain aspects of its expected financial performance, it does not, as a matter of course, make public disclosure of detailed forecasts or projections of its expected financial performance for extended periods due to, among other things, the uncertainty, unpredictability and subjectivity of the underlying assumptions and estimates. However, in connection with Microsemi's evaluation of strategic alternatives and a possible business combination transaction involving Microsemi, in early December 2017, Microsemi prepared certain projections and estimates of future financial and operating performance with respect to Microsemi's second, third and fourth quarters of fiscal year 2018, fiscal year 2019 and fiscal year 2020 (which we refer to as the December 2017 management projections), which it made available to the parties that had expressed interest in a business combination with Microsemi at that time (Microchip, Party B, Party C and Party D) as well as the Board and Qatalyst Partners. In late January 2018, to account for changes in U.S. tax laws and Microsemi's actual results for the first quarter of its fiscal year 2018, Microsemi prepared updated financial projections and estimates of future financial and operating performance for its fiscal years 2018 through 2023, including the calendar year ending December 31, 2018 (which we refer to as the January 2018 management projections), which it made available to the Board and Qatalyst Partners. A subset of the January 2018 management projections, consisting of certain prospective financial information with respect to the second, third and fourth quarters of fiscal year 2018, fiscal year 2019 and fiscal year 2020, was also made available to Microchip to assist with its due diligence review.

132.    Upon information and belief, the Individual Defendants caused the Microsemi acquisition to be signed on March 1, 2018, in the absence of performing adequate due diligence and/or recklessly ignoring the adverse information reviewed

during due diligence, so that the acquisition could be announced at the Company's Investor Day, held on March 1, 2018.

133.    During the Company's Investor Day presentation on March 1, 2018, Defendant Sanghi asserted that, "trying to have it land on the [investor] day, I signed [the Microsemi acquisition] deal one minute before market closed today 3:59 New York time. This was herculean task. We probably all lost some weight trying to get there."

134.    In the weeks following the March 1, 2018 announcement, and while the price of the Company's stock was artificially inflated due to the false and misleading statements alleged herein, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord, representing the entirety of the Company's Board during the Class Period in the Securities Class Action, sold Company shares on material inside information, in violation of the Company's insider trading policy, from which they received proceeds in the aggregate amount of over $3.7 million.

**False and Misleading Statements**

***March 1, 2018 Press Release***

135.    After markets closed on March 1, 2018, the Individual Defendants caused the Company to issue a press release announcing that Microchip would acquire Microsemi. The timing of the announcement was designed to coincide with the Company's Investor Day, held on March 1, 2018. The press release reported that the two companies had signed a definitive agreement under which Microsemi would be acquired for $68.78 per share, paid in cash. The March 1, 2018 Press Release further announced that Microchip "plans to finance the transaction with approximately $1.6 billion of cash from the combined company balance sheets, approximately $3.0 billion from Microchip's existing line of credit, approximately $5.0 billion in new debt and $0.6 billion of a cash bridge loan." That's $8.6 billion in new debt.

136.    The press release also quoted Defendant Sanghi as stating, in relevant part:

Microchip continues to view accretive acquisitions as a key strategy to deliver incremental growth and stockholder value. The Microsemi

acquisition is the latest chapter of this strategy and will add further operational and customer scale to Microchip

137.    The press release later asserted, "[f]ollowing the closing, the transaction is expected to be immediately accretive to Microchip's non-GAAP earnings per share."

138.    The press release quoted Defendant Moorthy as stating:

Microchip and Microsemi have a strong tradition of delivering innovative solutions to demanding customers and markets, thus ***creating highly valued and long-lasting revenue streams***. Joining forces and combining our complementary product portfolios and end market exposure will offer our customers a richer set of solution options to enable innovative and competitive products for the markets they serve[.]

(Emphasis added.)

### *Investor Day 2018*

139.    Also on March 1, 2018, and following the issuance of the above-mentioned press release, the Individual Defendants caused the Company to provide an Investor Day presentation. During the presentation, Defendant Sanghi characterized Microsemi as the "[f]irst company we're buying in our string of acquisitions, where their gross margin is higher than us." He also described the acquisition as, "strategically and financially, a very compelling transaction." Defendant Sanghi informed participants that Microsemi's sales were "about $1.875 billion annualized. A little higher gross margin, 63.2% and an operating income of 32.2%."

140.    During the Investor Day presentation, Defendant Sanghi added that "[w]e plan to rapidly deleverage post-transaction close through a combination of growth in free cash flow and the EBITDA expansion. So debt would be coming down, EBITDA would be growing, and coming from both sides, our denominator getting larger and numerator getting smaller, we will get that leverage down rapidly." Defendant Bjornholt chimed that Microchip had "significant free cash flow from the business, which allows us to de-lever very quickly."

141.    Defendant Sanghi stated during the presentation that the Microsemi "deal is accretive on day one without doing anything, without any synergy." The Investor Day slides made a similar assertion, stating, in relevant part, that the Microsemi "[t]ransaction is expected to be immediately accretive to our non GAAP earnings per share." The section of the slide deck dealing with the Microsemi transaction concluded by characterizing the Microsemi acquisition as: "Another Compelling Transaction!" in large, bold letters and highlighted in bright yellow.

142.    Following the announcement of the Acquisition, the Individual Defendants were provided additional due diligence by the Peterson Plaintiffs. Slander Action Complaint ¶106. One of those items was an Inventory Report provided to Microchip on April 11, 2018 that "clearly showed the amount of inventory held by all of Microsemi's distributors from 2015 through the first quarter of Microsemi's 2018 fiscal year and revealed that overall inventory levels remained steady throughout the period at, on average, three to four months." *Id.* ¶ 108. Further, according to the Peterson Plaintiffs, "Given [the Individual Defendants'] fiduciary duties to truly know what they were buying … Sanghi and the rest of Microchip's Board of Directors were satisfied that their diligence team had requested, and that Microsemi had provided, all of the information that [Microchip] needed in order to understand all material aspects of [Microsemi's] operations, especially its revenue recognition, sales, shipping practices, and how much inventory Microsemi and its distributors kept in the distribution channel … Sanghi and Microchip's Board of Director, therefore, concluded that the price Microchip was paying for Microsemi was fair, and the deal proceeded to close on May 29, 2018." *Id.* ¶ 263. At the same time, the Peterson Plaintiffs alleged that "Microchip and its attorneys wholly neglected to access a large portion of the information and documents in the Data Room prior to the Closing." *Id.* ¶ 101.

***May 29, 2018 Press Release***

143.    On May 29, 2018, the Company issued a press release titled "Microchip Technology Announces Completion of Microsemi Acquisition." The press release

42

quoted Defendant Sanghi as stating:

> We are very pleased to have completed our acquisition of Microsemi . . .
> I welcome the Microsemi employees into the Microchip family and look
> forward to working together to realize the benefits of a combined team
> pursuing a unified strategy. ***The Microsemi acquisition will significantly
> enhance our product portfolio, end-market diversification, operational
> capabilities and customer scale***.

(Emphasis added.)

144.    Regarding the financial effect of the transaction, the press release stated
that it "is expected to be immediately accretive to Microchip's non-GAAP earnings per
share.  Short term, we're targeting 18% growth in non-GAAP EPS from fiscal year '18
to fiscal year '19, with accretion from Microsemi and continuous improvement and
growth in our own business."

***May 31, 2018 Press Release***

145.    On May 31, 2018, the Company issued a press release titled "Microchip
Technology Provides Updated Guidance After Completion of Microsemi Acquisition."
The press release stated, in relevant part:

> Microchip   Technology   Incorporated,   a   leading   provider   of
> microcontroller, mixed signal, analog and Flash-IP solutions, today
> provided updated guidance for net sales and non-GAAP earnings per share
> for its fiscal first quarter of 2019 ending June 30, 2018, after the
> completion of the acquisition of Microsemi Corporation by Microchip.
> Microchip previously provided guidance on May 8, 2018 for consolidated
> non-GAAP net sales to be up between 1% and 6% sequentially with a mid-
> point of up 3.5%. Microchip expects non-GAAP net sales based on end
> market demand from Microsemi to add between $160 million to $180
> million to its June quarter results, and now expects consolidated non-
> GAAP net sales for the June quarter to be up 17% to 24% sequentially.
> ***Microchip expects Microsemi to add between 2 cents to 6 cents to non-
> GAAP earnings per share. The combined non-GAAP earnings per share
> for Microchip and Microsemi is expected to be between $1.41 and $1.55
> per share. The original guidance for Non-GAAP earnings per share was
> between $1.39 and $1.49 per share***. Microchip is not able to provide an
> estimate of its GAAP earnings per share at this time but will report its

GAAP results and provide reconciliations of its GAAP and Non-GAAP results with its earnings release in early August 2018.

(Emphasis added.)

146.    The press release quoted Defendant Sanghi as stating, in relevant part:

We completed our acquisition of Microsemi on May 29, 2018 and are excited about the future of the combined companies with our expanded product portfolio, end-market diversification, operational capabilities and customer scale . . . ***Our combined teams are now laser focused on delivering the synergies we identified, and to achieve the accretion targets*** which will enable us to rapidly start reducing our leverage.

(Emphasis added.)

***2nd Annual Needham Automotive Tech Day***

147.    On June 4, 2018, Defendant Moorthy presented at the 2nd Annual Needham Automotive Tech Day ("Needham") on behalf of the Company. The slide deck presented at Needham stated the following with respect to the Microsemi transaction: "Expect Microsemi to add $160M to $180M non-GAAP revenue in FQ1'19 [the quarter ended June 30, 3018], and non GAAP-EPS of $0.02 to $0.06."

***Bank of America Merrill Lynch 2018 Global Technology Conference***

148.    On June 6, 2018, Defendant Bjornholt presented at the Bank of America Merrill Lynch 2018 Global Technology Conference ("BofA Conference") on behalf of the Company. The slide deck presented at the BofA Conference stated the following with respect to the Microsemi transaction: "Expect Microsemi to add $160M to $180M non-GAAP revenue in FQ1'19, and non GAAP-EPS of $0.02 to $0.06."

149.    The slide deck presented at the BofA Conference further asserted, with respect to the Microsemi acquisition, that:

- ***Transaction is expected to be immediately accretive to our non GAAP earnings per share***

- Short term: Targeting 18% growth in non-GAAP EPS from FY18 to FY19 with accretion from Microsemi (assumes June 2018 close)

○ Microsemi adds ~75 cents of non-GAAP EPS accretion annualized run rate in the first year after close

(Emphasis added.)

150.     The statements in ¶¶ 135–41, 143-49 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that the Acquisition would be "immediately accretive," or that the Company would generate enough free cash flow to "rapidly deleverage post-transaction close through  a growth in free cash flow and the EBITDA expansion"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the Acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks, or recklessly disregarded such information; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *2018 Proxy Statement*

151.     The Company filed its 2018 Proxy Statement with the SEC on July 12, 2018. Defendants Sanghi, Chapman, Day, Johnson, and Meyercord solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[9]

---

[9] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

152.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> In May 2004, our Board of Directors adopted a Code of Business Conduct and Ethics for our directors, officers (including our chief executive officer and chief financial officer), and employees. A copy of the Code of Business Conduct and Ethics, as amended to date, is available on our website at the About Us/Investor Relations section under Mission Statement/Corporate Governance on *www.microchip.com.*

> We intend to post on our website any amendment to, or waiver from, a provision of our code of ethics within four business days following the date of such amendment or waiver or such other time period required by SEC rules.

153.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by six of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

154.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, including equity compensation designed to "align [executive officers'] collective interests with the interests of our stockholders" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

155.    The 2018 Proxy Statement also failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that the Acquisition would be "immediately accretive" or that the Company would generate enough free cash flow to "rapidly deleverage post-transaction close through  a growth in free cash flow and the EBITDA expansion"; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the

46

time of the Acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks, or recklessly disregarded such information; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### ***The Truth Begins to Emerge***

156.    On August 9, 2018, the Company issued a press release titled "Microchip Technology Announces Financial Results for the First Quarter of Fiscal Year 2019." This fiscal period included one month of post-Microsemi acquisition operating results. The press release quoted Defendant Sanghi as stating:

> Since our acquisition of Microsemi Corporation on May 29, 2018, we have been actively engaged in further understanding the opportunities and challenges of this business. While we have lots of work to do to achieve our long-term financial targets, we have high confidence in our team's ability to achieve these results over time.

157.    After markets closed on August 9, 2018, the Company held an earnings call with analysts and investors to discuss its financial results for the quarter ended June 30, 2018. During the call, Defendant Bjornholt stated the following regarding the Company's revenue recognition practices:

> I want to remind investors that during the quarter ending June 30, 2018, we adopted a new GAAP revenue recognition standard, which requires revenue to be recognized at the time products are sold to distributors versus our historical revenue recognition policy, where revenue on such transactions were deferred until the product was sold by our distributors to an end customer. We are not able to provide guidance on a GAAP basis, as we are not able to predict whether inventory at our distributors will increase or decrease in relation to end market demand, as this is not how we manage our business. As evidence of this uncertainty, in recent years we have seen net inventory at our distributors increase or decrease by a significant amount in a single quarter. Our non-GAAP revenue is based on true end market demand in which we measure the revenue based on when the product is sold by our distributors to an end customer. We will continue to manage our business and distributor relationships based on

creating and fulfilling end market demand. All of Microchip's bonus programs will continue to work based on the amount of revenue earned from fulfilling market demand. Therefore, along with GAAP results based on sell-in, we will also report our non-GAAP results based on sell-through revenue recognition.

158.   Regarding the Company's inventory, Defendant Bjornholt stated, in relevant part:

Moving on to the balance sheet, our inventory balance at June 30, 2018 was $1.105 billion, including $359.7 million of inventory mark-up from Microsemi required for GAAP purchase accounting. Excluding the inventory mark-up, we had 119 days of inventory at the end of the June quarter. Our targeted inventory levels are between 115 and 120 days. Inventory at our distributors in the June quarter were at 40 days compared to 36 days at the end of March. The *historical Microchip distributor inventory was actually down by about a day in the June quarter but the consolidated increase is driven by the high inventory in the Microsemi distribution channel. We expect the Microsemi distribution inventory to reduce through the end of calendar year 2018*.

(Emphasis added.)

159.   Defendant Sanghi provided commentary on the Microsemi acquisition, specifically inventory levels in the distribution channel. Defendant Sanghi stated, in relevant part:

In the case of Microsemi, *we found that Microsemi management was extremely aggressive in shipping inventory into the distribution channel*. Microsemi's distributors had about four months of inventory, whereas Microchip's distributors carry about two and a half months of inventory. While we have seen some excess shipments of inventory into the distribution channel in other acquisitions, *we have never seen as much excess as we found in the case of Microsemi*. Microsemi also always shipped into the contract manufacturers by making deals and offering discounts. *This excessive distribution in contract manufacturers' inventory will provide some headwind for revenue for the next couple of quarters*. *Our trailing EBITDA and the next two quarters of cash generation will also be impacted by needing to correct this inventory for Microsemi products*.

(Emphasis added.)

160.     Regarding the spending culture at Microsemi, Defendant Sanghi stated, in relevant part:

> We also found a culture of excessive extravagance and high spending. The company had millions of dollars of sponsorships and several luxury suites in sports stadiums, luxury private plane travel, and generous sponsorships for many conferences, stadiums, and other venues that are a waste of shareholders' money. We are undoing commitments to all such spending.

161.     Defendant Sanghi outlined the following steps that the Company was taking to resolve the above issues, stating, in relevant part:

> So what are we doing to clean up our excess inventory and other spending? We did not make any deals with the distribution, contract manufacturers, or end customers in the month of June to ship excess inventory. As a result, *we shipped close to $100 million less in the month of June than Microsemi's ex-management would have shipped*. That was nearly half the inventory correction accomplished in a single month. We expect to achieve the balance of the distribution inventory correction in the next two quarters and nearly complete the correction by the end of this calendar year.
>
> Based on high inventory in distribution, as well as inside Microsemi, we have substantially cut back on the manufacturing build plan in internal factories, as well as foundries and assembly test subcontractors. The vast majority of Microsemi business is subcontracted so we will see a dollar-for-dollar cash saving, which will offset the negative cash impact of -- some of the negative cash impact of inventory correction.

162.     Defendant Sanghi engaged in the following discussion with an analyst regarding Microsemi's aggressive sales practices:

> **William Stein** -- *SunTrust Robinson Humphrey -- Analyst*
>
> Thanks. And as a follow-up, I just want to make sure I understand the discussion point around Microsemi's having stuffed not only the distribution channel but other sort of channels, including, it sounds like, direct customers as well. And when we marry that up with Microchip's approach to rev rec, which is sell-through, the reduction in inventory in the channel, that doesn't actually reduce your non-GAAP revenue. Maybe perhaps a shortfall in your outlook on the revenue side is more driven by

the reductions in inventory perhaps at contract manufacturing and other direct customers, but not what's going to distribution. Is that the right way to think about it?

**Steve Sanghi** -- *Chairman and Chief Executive Officer*

Well, good question. Very good question. That would be the case if everything was pure. But everything was not pure. They had also -- ***ex-management had also taken -- every quarter, they would take some direct customers and move them to distribution by giving distribution some discount so they could make a margin on it. And in doing so, they would take the next couple of quarters of product for that customer and stuff them into distribution***. So, therefore, you get to recognize higher sell-in revenue because, to the end customer, you only ship 1x, but to the distributor, you can give them 1.5x or 2x. And they would do some of that every quarter. ***So there was, overall, more than a couple hundred million dollars of direct accounts had been moved to distribution over the last year or so***. And you can't totally put your finger on it but a lot of that seemed to coincide when it was sort of decided when the company would be sold. There is some timeline you can triangulate to. It's not something I can really prove.

* * *

Therefore, there is inventory sitting in distribution for the direct customers. And ***those direct customers, we are converting them back to direct customers but they won't be buying anything for a little while until the distribution has cleared out their inventory***, shipping it to the direct customers.

(Bolded names and italicized titles in original of transcript. Emphasis added in bold & italics.)

163.   In response to another analyst's question about revenue recognition at Microsemi, Defendant Sanghi stated, in relevant part:

So ordinarily a management team, in managing the business, will ship to distribution roughly what distribution ships out and have the distribution inventory grow only by the amount of distribution shipping amount, in terms of business growing. That's not really what happened here, hiding under the revenue recognition that sell-in is a revenue recognition. There were a large number of deals made with the distribution. When the inventory got higher and higher, they even offered interest subsidy to the distributor to carry inventory beyond a certain number of months, because

the distributor wouldn't want to carry -- he has his money tied up. And they would off interest subsidy. So basically shipping to distribution was made an art form almost. So, yes, the revenue was higher than the real end market demand.

Now, at this point in time, we're not totally prepared to give you that number. I think it's not extremely large. It's in a few percentage range. But we need to clear out this inventory over the next one or two quarters and, ourselves, be comfortable with what the run rate is. There will be, as we clean out this inventory over the next couple of quarters, there will be a larger revenue increase as we head toward the full board shipment, because inventory correction is over. So there will be some attenuation out in time of the growth rate, and I think we'll provide you some guidance over time, but not today.

164.    Defendant Sanghi provided the following color on Microsemi's sales practices, stating: "inventory was jammed through incentives and discounts and, to smaller distributors, even threatening." Regarding the effect of these sales practices, he further noted that "there are products in distribution from Microsemi that will take two years to clear."

165.    In response to a question regarding the timing of channel stuffing by Microsemi, Defendant Sanghi stated:

Well, there are a lot of moving parts and you can't put a complete finger on it because there is some EOL mechanism with which they put the distribution inventory. Normal amount of inventory was very high. There was a huge non-linearity. A lot of stuff was shipped undetermined. There was also this direct to distribution conversion. So there were a lot of these programs interlayered. And I'm not accusing anything but I'm just saying that the timing, roughly, it all started about a year or so ago, which is more like when the conversations about the acquisition began. But I couldn't prove that. I think it's very, very rough.

**Christopher Rolland** -- *Susquehanna International Group -- Analyst*

Yeah. ***Sounds pretty common in a lot of these deals.***

(Bolded names and italicized titles in original of transcript. Emphasis added in bold & italics.)

166.     Defendant Sanghi noted that Microchip and Microsemi had distributors in common, and that Microsemi's channel stuffing had worn on its relationship with distributors, stating, in relevant part:

> So, as we have interfaced with a lot of the distributors -- some of them, by the way, a fair number of them are common with Microchip. The largest distributor was Arrow Electronics and our largest distributor is Arrow Electronics. And similarly there are some other common distributors in Asia and Japan and Europe and others. A large amount of interaction with the distributors was how much inventory they would take. Basically, beginning around the middle of the quarter -- and large amount of, I would say, tension with the distributor was largely how much inventory would you take.
>
> And so, as we have spoken with the distributors, distributors feel refreshed and seeing that you're not going to force me to take inventory that I never wanted. You will, in fact, let me drain down my inventory. And so we can have a conversation about demand creation, reference design, how can we together build the business, let's go call on common customers, let's highlight and beef up the website and put reference designs and solutions on it. How do we take advantage of Total Systems Solution, Microchip and Microsemi common products going into the same platform? On and on and on. So conversations with distributors have turned into positive interactions regarding growing the business. And before that -- and this is distributors telling us. The ex-management of Microsemi is gone. Distributors are telling us that this tension about such a large amount of inventory jamming took all the oxygen out of the room. It just consumed the entire energy and interaction with the distributors.

167.     As a result of these shared distributors, the Individual Defendants should have been able to discover the Microsemi's aggressive sales practices leading up to Microchip's acquisition of Microsemi. Indeed, Christopher Rolland of Susquehanna International Group characterized such behavior as "pretty common" in similar business combinations during the August 9, 2018 conference call.

168.     During the August 9, 2018 conference call, Defendant Sanghi stated that "we expect total non-GAAP net revenue in the September quarter to be between $1.474 billion to $1.55 billion." This was below the revenue for the quarter ended September

30, 2018 of $1.59 billion projected by analysts based on the Company's prior public statements prior to August 9, 2018.

169.    Analysts pointed to Microsemi's channel stuffing as the source of the revenue shortfall. As an analyst from JP Morgan asserted:

> We believe that 70% of the miss was from [Microsemi] and attributed to [Microsemi] distribution channel stuffing which implies that true end demand revenue was well below what [Microsemi] had been reporting over the last few quarters. As a result, [Microsemi] had inflated revenues leading up to the acquisition (sell-in revenue recognition).

170.    On this news, the price per share of Microchip's public stock fell $10.67, or nearly 11%, from their closing price on August 9, 2018 to close at $97.41 on August 10, 2018.

171.    On November 7, 2018, the Company issued a press release announcing its financial results for the quarter ended September 30, 2018. The press release reported net sales of $1.513 billion, just above the $1.512 billion midpoint of guidance provided on August 9, 2018.

## DAMAGES TO MICROCHIP

172.    As a direct and proximate result of the Individual Defendants' conduct, Microchip has lost and will continue to lose and expend many millions of dollars.

173.    Such expenditures include, but are not limited to, legal fees and any judgment and/or settlement associated with the Securities Class Action filed against the Company, its Chairman and CEO, and its President and COO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

174.    Such expenditures include, but are not limited to, legal fees and any judgment and/or settlement associated with the Slander Action filed against the Company, its Chairman and CEO, its President and COO, its CFO and Vice President, and its Vice President, Worldwide Sales & Applications, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

175.   Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

176.   These costs further include those associated with overpaying for Microsemi and the increased cost of capital and debt due to the Company's worsened financial condition, as well as any reputational damage.

177.   As a direct and proximate result of the Individual Defendants' conduct, Microchip has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

178.   Plaintiff brings this action derivatively and for the benefit of Microchip to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Microchip, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

179.   Microchip is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

180.   Plaintiff is, and has been at all relevant times, a shareholder of Microchip. Plaintiff will adequately and fairly represent the interests of Microchip in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

181.   Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

182.   A pre-suit demand on the Board of Microchip is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following five

Individual Defendants: Defendants Sanghi, Chapman, Day, Johnson, and Meyercord (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors who are on the Board at the time this action is commenced.

183.   Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their wrongdoing involving: (a) overpaying and incurring in excess of $8 billion in new debt in the Acquisition and the recklessly performed due diligence by the Individual Defendants in violation of their fiduciary duties in connection with the Acquisition; (b) materially false and misleading statements issued or permitted to be issued by the Individual Defendants concerning the Acquisition, subjecting the Company to potential liability in the Securities Class Action; (c) issuing a false and misleading proxy statement in violation of the federal securities laws; and (d) the insider trading of all five of the Company directors at artificially inflated per share prices with knowledge and/or reckless disregard of the nonpublic adverse information concerning Microsemi's excess inventory at the distributorship level.

184.   The Directors were well aware of the importance of conducting due diligence into Microsemi's distributor inventory and sales practices based on their own prior experience and Microchip's own financial reporting disclosure process monitored by the Audit Committee Defendants and reported to the entire Microchip Board, which in stark contrast to Microsemi's limited disclosure of only distributor sales, emphasized transparency that caused Microchip to publicly report both sales to distributors and end users, a more accurate portrayal of a Company's financial performance.

185.   Specifically, Microchip recognized revenue based on direct sales to distributors as required by GAAP and disclosed those revenue figures publicly. Non-GAAP "sell-through" net sales to end users was the more important metric to the Directors and investors. Throughout the Relevant Period, the Directors managed the Company on a "sell-through' revenue basis, not "sell-in" (sales to distributors). Indeed, in SEC filings, press releases, earnings conference calls and investor presentations,

Microchip discussed the Company's own inventory levels, inventory levels at distributors and sales at both the distributor and end user.

186.    In earnings conference calls held on February 7, 2017; May 9, 2017; August 3, 2017; November 6, 2017; and February 6, 2018 (all prior to the Acquisition) the Individual Defendants emphasized that non-GAAP results provided more meaningful reporting of financial performance.

187.    In stark contrast to the Company, Microsemi did not publicly report inventory levels at distributors or sell through sales to end users. Rather, Microsemi reported only sell-in sales (sales to distributors). Without such information, the Directors would be at a loss to determine the true value of Microsemi and ultimately over payed for a company that turned out to have excessive inventory, incurring an additional $8.6 billion in debt to consummate the Acquisition.

188.    The Directors had just recently got burned in the acquisition of Atmel, another company similar to Microsemi, that did not report inventory at distributors nor sales to end users but reported solely sales to distributors, as did Microsemi. That acquisition turned out to be a disaster because of the material amounts of inventory Atmel had stuffed into the channel at the distributorship level, the same thing Microsemi did as reveled after the close of the market on August 9, 2018. The Atmel acquisition was a red flag for the Directors.

189.    Yet despite the importance that the Directors placed on inventory levels and end user revenue metrics, they should have known the inventory levels at Microsemi and end users sales as part of their due diligence and how that excess inventory would negatively impact both distributor and end user revenue, and would lower free cash flow going forward, resulting in the inability to pay down the $8.6 billion in debt incurred in the Microsemi Acquisition. The failure to conduct due diligence into inventory levels at the distributorship level and end user sales is inexcusable and either the due diligence conducted was inadequate or the Directors turned a blind eye to the information made available to them by Microsemi.

190.    A separate theory of liability exists for the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while all five of the Directors engaged in insider sales based on material non-public information, all of which occurred shortly after the announcement of the Acquisition, netting proceeds of over $3.7 million, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Directors Day, Chapman and Johnson (a majority of the Directors for purposes of demand futility) sold over 35%, over 20%, and over 27%, of their personally held Company stock, respectively, just days after the announcement of the Microsemi Acquisition>

191.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors through the Microsemi Acquisition, which was purportedly immediately accretive to earnings and which would generate substantial free cash flow that would quickly pay down the $8.6 billion in debt the Company incurred in the Acquisition.. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

192.    The Directors knew of the falsity of the misleading statements at the time they were made, or acted with reckless indifference in failing to be aware of their falsity. The Acquisition was highly material to the core operations of Microchip. It was repeatedly represented by Microchip that the Acquisition would be immediately accretive to earnings and materially increase free cash flow.

193.    As Board members of Microchip who were charged with overseeing the Company's affairs, Directors Sanghi, Chapman, Day, Johnson, and Meyercord all must have had knowledge of or recklessly disregarded information pertaining to the Acquisition concerning the inventory levels at the Microsemi's distributors that

indicated that Microsemi had stuffed the channel with product  Specifically, as Board members of Microchip, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord must have been aware of, or recklessly disregarded, the material facts surrounding the Acquisition, including the results of due diligence, and any deficiencies in the due diligence process.

194.    Indeed, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord were motivated by hubris and greed to sign the Acquisition agreement in time to announce the deal at the Company's March 1, 2018 Investor Day. By getting the deal signed by that deadline, the Directors increased exposure for the Acquisition, enhancing any increase to the Company's stock price in reaction to the announcement. This allowed each of the Directors to make lucrative insider sales of Company stock at artificially inflated prices over the following two weeks. As Defendant Sanghi himself admitted at the Investor Day conference, he "signed [the Microsemi acquisition] deal one minute before market closed today 3:59 New York time. This was herculean task."

195.    Therefore, Defendants Sanghi, Chapman, Day, Johnson, and Meyercord each knew of or recklessly disregarded  the falsity of the statements and misleading omissions detailed herein at the time such statements and omissions were made, and further failed to exercise or recklessly disregarded their duty of oversight to correct and cease the making of such misleading statements and omissions.

196.    Additional reasons that demand on Defendant Sanghi is futile follow. Defendant Sanghi has served as a Company director since 1990, as the Company's CEO since 1991, and as the Company's Chairman since 1993. Thus, as the Company admits, Defendant Sanghi is a non-independent director. He receives handsome compensation, including nearly $7.9 million in the fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Acquisition, and which yielded approximately $1.9 million in proceeds, demonstrates his motive in facilitating and participating in the scheme. As the Company's CEO and Chairman, Defendant Sanghi had a duty to ensure that adequate due diligence was

conducted with respect to the Acquisition. As a long-time Company Chairman and CEO, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Sanghi personally made many of the false statements and omissions of material fact that are alleged herein, including in press releases and conference calls. He also solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Sanghi breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.   Additional reasons that demand on Defendant Chapman is futile follow. Defendant Chapman has served as a Company director since 1997, and is the Chair of the Audit Committee. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Acquisition, and which yielded approximately $564,492 in proceeds, demonstrates his motive in facilitating and participating in the scheme. As a member of the Audit Committee and SEC defined "audit committee financial expert," Defendant Chapman had a duty to ensure that adequate due diligence was conducted with respect to the Acquisition. As a long-time Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Chapman solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Chapman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Day is futile follow. Defendant Day has served as a Company director since 1994. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transactions before the fraud was exposed, made less than a week after the announcement of the Acquisition, and which yielded approximately $570,720 in proceeds, demonstrate his motive in facilitating and participating in the scheme. As a long-time Company director, Defendant Chapman had a duty to ensure that adequate due diligence was conducted with respect to the Acquisition, and he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Day solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Further, Defendant Day cannot independently consider a demand to take action against Defendant Sanghi. Day has written a fabulous review of Sanghi as a forward to Sanghi's book, *Driving Excellence: How the Aggregate-system Tuned Microchip Technology from a Failing Company to a Market Leader.*  Day stated that he's known Sanghi since he was "one of Intel's promising young stars." Defendant Sanghi worked at Intel from 1978-1988, meaning he's known Day for at least 30 years. Additionally, Sanghi hired Day to work as a consultant for Microchip. Thus, for these reasons, Defendant Day breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

199.    Additional reasons that demand on Defendant Meyercord is futile follow. Defendant Meyercord has been a Company director since 1999, and is a member of the Audit Committee. He receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. His insider transaction before the fraud was exposed, made within days of the announcement of the Acquisition, and which yielded approximately $474,590 in proceeds, demonstrates his motive in facilitating and participating in the

scheme. As a member of the Audit Committee and SEC defined "audit committee financial expert," Defendant Meyercord had a duty to ensure that adequate due diligence was conducted with respect to the Acquisition. As a long-time Company director, and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme. Defendant Meyercord solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. Thus, for these reasons, Defendant Meyercord breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has been a Company director since 2013, and is a member of the Audit Committee. She receives handsome compensation, including $164,568 in fiscal year ended March 31, 2018. Her insider transaction before the fraud was exposed, made within two weeks of the announcement of the Acquisition, and which yielded approximately $222,732 in proceeds, demonstrates her motive in facilitating and participating in the scheme. As a member of the Audit Committee, Defendant Johnson had a duty to ensure that adequate due diligence was conducted with respect to the Acquisition. As a trusted Company director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, and consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme. Defendant Johnson solicited the 2018 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Johnson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

201.     In violation of the Code of Conduct, the Directors breached their duty to ensure that adequate due diligence was conducted with respect to the Acquisition. Further, the Directors conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Directors engaged in insider sales of Microchip stock during the Relevant Period, failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

202.     Microchip has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Microchip any part of the damages Microchip suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

203.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

204.     The acts complained of herein constitute violations of fiduciary duties owed by Microchip's officers and directors, and these acts are incapable of ratification.

205.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Microchip. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Microchip, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

206.    If there is no directors' and officers' liability insurance, then the Directors will not cause Microchip to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

207.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or

63

on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

210.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

211.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

212.    Under the direction and watch of the Directors, the 2018 Proxy Statement failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that the Acquisition would be "immediately accretive," or that the Company would generate enough free cash flow to pay down the $8.6 billion in debt incurred in the Acquisition quickly; (2) the Company lacked fundamental knowledge of Microsemi's business operations and prospects at the time of the Acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks, or recklessly disregarded such information; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants'

statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

213.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

214.    The 2018 Proxy Statement also made reference to the Company's Code of Conduct. The Code of Conduct required the Company and Individual Defendants to abide by relevant laws and statutes, make accurate and non-misleading public disclosures, deal fairly with the public, and not engage in insider trading. By issuing false and misleading statements to the investing public and engaging in insider trading, the Individual Defendants violated the Code of Conduct. The 2018 Proxy Statement failed to disclose these violations and also failed to disclose that the terms of the Code of Conduct were being violated.

215.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2018 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2018 Proxy Statement, including but not limited to, election of directors, ratification of an independent auditor, and the approval of officer compensation.

216.    The false and misleading elements of the 2018 Proxy Statement led to the re-election of Defendants Sanghi, Chapman, Day, Johnson, and Meyercord, which allowed them to continue breaching their fiduciary duties to Microchip.

217.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2018 Proxy Statement.

### SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

218.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

219.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Microchip's business and affairs.

220.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

221.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Microchip.

222.    In breach of their fiduciary duties owed to Microchip, the Individual Defendants willfully or recklessly failed to conduct adequate due diligence into the Acquisition and caused the Company to overpay for Microsemi and incur an additional $8.6 billion in debt.

223.    In further breach of their fiduciary duties owed to Microchip the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) Microchip had not conducted adequate due diligence in connection with the Acquisition, or recklessly disregarded information obtained from Microsemi, and thus lacked a reasonable basis to assert that the Acquisition would be "immediately accretive," or that the Company would generate enough free cash flow to pay down the $8.6 billion in debt incurred in the Acquisition quickly; (2) the Company lacked fundamental knowledge of

Microsemi's business operations and prospects at the time of the Acquisition, including the amount of inventory in the channel, or its spending on promotions and executive perks, or recklessly disregarded such information; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

224.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

225.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, six of the Individual Defendants benefitted themselves by engaging in lucrative insider sales on material inside information.

226.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

227.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microchip's securities, and disguising insider transactions.

228.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless

disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Microchip's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

229.     The failure to conduct adequate due diligence into the Acquisition, permitting the Company to issue materially false and misleading statements, and engaging in insider trading (for six of the seven named defendants)  were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

230.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Microchip has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

231.     Plaintiff on behalf of Microchip has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

232.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Microchip.

234.     The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Microchip that was tied to the performance

or artificially inflated valuation of Microchip, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

235.    Plaintiff, as a shareholder and a representative of Microchip, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

236.    Plaintiff on behalf of Microchip has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Microchip, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Microchip;

(c)    Determining and awarding to Microchip the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Microchip and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Microchip and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the

policies and guidelines of the board;

2.  a provision to permit the shareholders of Microchip to nominate at least three candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Microchip restitution from Individual Defendants, and each of them;

(f)   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 1, 2019

**TIFFANY & BOSCO, P.A.**

By:  */s/ Richard G. Himelrick*
Richard G. Himelrick
Seventh Floor Camelback Esplanade II
2525 East Camelback Road
Phoenix, AZ 85016
*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
Stuart J. Guber
240 Townsend Square
Oyster Bay, NY 11771
*Counsel for Plaintiff*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail notice list, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*s/ Shelley Boettge*
Shelley Boettge

## VERIFICATION

I, Mark Kistenmacher, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder first amended derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on 6/25/2019 .

DocuSigned by:

*Mark Kistenmacher*

MARK KISTENMACHER